843 So.2d 229 (2001)
Ex parte State of Alabama.
(Re Melvin VINSON, Jr. v. STATE of Alabama).
1992037.
Supreme Court of Alabama.
October 12, 2001.
William H. Pryor, Jr., atty. gen., and P. David Bjurberg, asst. atty. gen., for petitioner.
J. William Cole of Luker, Cole & Associates, L.L.C., Birmingham, for respondent.
HARWOOD, Justice.[1]
This Court granted the petition for certiorari filed by the State to review the judgment of the Court of Criminal Appeals reversing Melvin Vinson's convictions for unlawful distribution of a controlled substance and unlawful possession of a pistol after having been convicted of a crime of violence. See Ala.Code 1975, §§ 13A-12-211 and 13A-11-72(a). Vinson was sentenced *230 to a period of imprisonment.[2] He appealed to the Court of Criminal Appeals; that court reversed his conviction. Vinson v. State, 843 So.2d 221 (Ala.Crim.App. 2000).
The Court of Criminal Appeals set out the facts as follows:
"Two college students were apprehended for selling drugs; they cooperated with police and disclosed that Melvin Vinson was their drug source. On November 21, 1994, as a result of the information provided by the college students, the officers obtained and executed a search warrant for Melvin Vinson's residence. The affidavit in support of the search warrant stated that the college students told Officer [Elden] Willingham that on November 11, 1994, they had gone to Vinson's house and were given one pound and three ounces of marijuana on consignment.
"Agent [Guy] Warren and three other officers went to Vinson's residence around 8:00 p.m. to conduct their search. The officer knocked on the door; there was no answer. The officers contacted the apartment manager and secured a key, which they used to enter the apartment. No one was in the apartment when the officers began the search. While the officers were conducting the search, they received a telephone call from another agent who told them Vinson had been in Tuscaloosa and was on his way back to Birmingham.
"As the officers were searching Vinson's residence, they were notified over the radio that a white male was walking up the steps to the back door. Vinson took one step into his dark apartment and was confronted by four officers who identified themselves as the police. Vinson threw his hands into the air and dropped a brown leather satchel. Although there was a discrepancy in the record as to exactly where Vinson dropped the leather satchel, it was dropped close to Vinson's feet, either inside the apartment or outside at the doorsteps of the apartment.
"Two officers secured Vinson by taking him by the arm, performing a patdown to ensure he did not have any weapons on his person, and then sat him down. Officer Warren testified that after Vinson was secured by the two officers, [Officer Warren] `picked up the brown satchel that was there and located a handgun in it.' Officer Warren testified that he did not know if he unzipped the bag or not, but he did remember that the bag had to be unzipped. Officer Warren stated that Vinson was on the porch about half an arm's length from the door when he dropped the bag.
"Vinson immediately began to make spontaneous voluntary statements as to where he had been and what he had been doing. The officer testified at trial that `[Vinson] said that he had gotten back from Tuscaloosa and went into two *231 college kids' apartment and took their property that was in the car.' The officer stopped him, told him to calm down, and read him his Miranda[[3]] rights. Vinson continued to talk. He told the officer that he had gone to Tuscaloosa to see two college kids who owed him $2,100 for some marijuana he had `fronted' them. However, he said that the students were not home, and because Vinson was unable to collect his money, he decided to take an electric guitar and other electrical equipment from them. Vinson also admitted that he owed money to his supplier. Vinson was afraid his supplier would kill him if he did not get the money.
"Vinson gave the police oral consent to search his vehicle to retrieve the stolen items. Vinson agreed to cooperate with police, but he later refused to cooperate. After searching records at the National Crime Information Center, the police discovered that Vinson should not have been in possession of a firearm. Several weeks later Vinson was charged and arrested for violating § 13A-11-72, `Certain persons Forbidden to Carry a Firearm.'"
843 So.2d at 224-25 (citations to record omitted).
The Court of Criminal Appeals also noted that the trial court had granted the defense's motion to suppress the evidence seized as a result of the search because it concluded that the search warrant was deficient in that the warrant was based upon "stale" information. Specifically, the Court of Criminal Appeals stated:
"The affidavit in support of the search warrant stated that drugs were observed in Vinson's residence on November 11, 1994; however, the search warrant was not executed until 8:00 p.m. on November 21, 1994. Thus, the trial court held that the search warrant was insufficient."
843 So.2d at 225. Although the Court of Criminal Appeals accepted the trial court's determination that the warrant was deficient because it was based on stale information, it reviewed the trial court's denial of Vinson's motion to suppress as to evidence seized as a result of the search of Vinson's bag and as to the statements made by Vinson when he was confronted by the police in his apartment. The trial court had determined generally that the search of the bag Vinson dropped was not within the scope of the execution of the warrant and that Vinson's statements were not due to be suppressed because, it found, those statements were voluntarily made after Vinson had received the warning required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Court of Criminal Appeals reversed the judgment of the trial court because it concluded that the deficient warrant made the officers' presence in Vinson's apartment illegal, and, therefore, the officers were not legally in a position to confront Vinson and to obtain access to his bag or to take his statements.
Thus, this Court is presented with the question whether the Court of Criminal Appeals properly concluded that the trial court had correctly determined that the warrant was deficient because it was based upon stale information.
The evidence presented at the hearing on Vinson's motion to suppress consisted of the testimony of the officers who executed the warrant. That evidence was undisputed. Accordingly, we review the trial court's decision to grant the motion to suppress under a "de novo" standard of review. Ornelas v. United States, *232 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); State v. Hill, 690 So.2d 1201 (Ala.1996); and State v. Smith, 785 So.2d 1169 (Ala.Crim.App.2000). We apply this standard to the general question whether the affidavit of Agent Guy Warren was sufficient to supply probable cause to issue the warrant.
"`Probable cause must be determined by an analysis of "the totality of the circumstances." Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). In determining whether to issue a search warrant, the issuing magistrate is to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of the person supplying the information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"
Loggins v. State, 771 So.2d 1070, 1080 (Ala.Crim.App.1999), aff'd, 771 So.2d 1093 (Ala.2000) (quoting Marks v. State, 575 So.2d 611, 614-15 (Ala.Crim.App.1990)).
The critical issue in determining whether probable cause existed in this case is whether the information contained in the affidavit was so "stale" that its effect had degraded below the level required for probable cause.
As already noted, the opinion of the Court of Criminal Appeals states that Agent Warren's affidavit recited that the two college students who had been apprehended for selling drugs "told Officer Willingham that on November 11, 1994, they had gone to Vinson's house and were given one pound and three ounces of marijuana on consignment." Vinson, supra, 843 So.2d at 224. The affidavit, contained in the record before this Court, also included the following additional pertinent information: Agent Warren had "been a State Trooper since February 1985 [and] a narcotics investigator since April 1987" and had been "assigned to numerous investigations involving narcotics activities." His investigations had kept him "in close contact with other agents investigating narcotics trafficking" and "based on [his] training and experience" he knew "[t]hat drug traffickers commonly `front' (provide illegal controlled substances on consignment) to their clients [and that] books, records, receipts, handwritten notes, ledgers, and audiotape recordings are maintained for the purpose of documenting fronted controlled substances to these individuals... at a residence, business, or safety deposit box where the individual has ready access to these documents and they are concealed from law enforcement authorities." Agent Warren's affidavit stated that on November 14, 1994, a reliable confidential informant had purchased one-half pound of marijuana from two male university students in Tuscaloosa for $935. The students were then apprehended and they informed investigating agents that they had additional marijuana at their residence, which they turned over to the agents. The two students explained that on November 11, 1994, they had gone to Vinson's residence in Birmingham "and that while there they were giv[en] one pound three ounces of marijuana on consignment." They told the agents, including Warren, "that they had been to Vinson's residence on four other occasions where they were furnished marijuana" by Vinson and "that they owed Vinson $2100.00 from marijuana given to them on consignment." The affidavit went on to explain that on November 20, 1994, the day before the execution of the affidavit and the issuance of the search warrant, the two students telephoned Vinson at his residence, under the supervision of a narcotics agent who recorded the telephone conversation. During that call they told *233 Vinson that they intended to pay him very soon, but he nonetheless threatened them by saying "I will cut you all over. Name the time of your death." He told them that "if he did not have the money by 8:00 p.m., on 11/21/94 he would go to Tuscaloosa [and] find them," again stating that he would "cut [them] all over." Agent Warren concluded his affidavit by stating that, based on the recited information, he had probable cause to believe that Vinson was "concealing a quantity of marijuana and evidence of illegal-drug activities through records, proceeds, and monies" at his residence. (Emphasis supplied.)
Whether the circumstances recited in an affidavit offered in support of an application for a search warrant are such that the probable cause that might once have been demonstrated by them has grown "stale" is a matter that "must be determined by the circumstances of each case." Sgro v. United States, 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932).
"Where the affidavit recites a mere isolated violation it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time. However, where the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant."
United States v. Johnson, 461 F.2d 285, 287 (10th Cir.1972).
"[T]he `basic criterion as to the duration of probable cause [or staleness] is the inherent nature of the crime.'" United States v. Magluta, 198 F.3d 1265, 1271 (11th Cir.1999) (quoting United States v. Bascaro, 742 F.2d 1335, 1345 (11th Cir. 1984)). In Moore v. State, 416 So.2d 770 (Ala.Crim.App.1982), Alabama recognized that a determination of "staleness" must turn on the circumstances of each case. In Moore, the Court of Criminal Appeals concluded that the information in an affidavit supporting a search warrant was not so stale as to negate a finding of probable cause, even though some of the information in the affidavit concerning the allegedly stolen items sought by the warrant was approximately two months old at the time the warrant was executed. The court in Moore considered staleness in terms of whether the affidavit information was "fresh" or "remote," and stated:
"What is `fresh' and how is it distinguished from `remote?' We do not perceive of any magical formula by which a precise computation of the time period may be made. Rather, the underlying circumstancesincluding such matters as the basis of the informant's knowledge, the ease or difficulty in moving the items since they were last observed, the use or probable use to which the items are put, and the mobile nature or degree of permanence of the place of concealmentmust be examined by a neutral and detached magistrate to reach a determination as to the probability of whether the proof speaks as of the time of the issuance of the search warrant."
416 So.2d at 772. See also Nelms v. State, 568 So.2d 384 (Ala.Crim.App.1990).
In this case, the last time the two students were in Vinson's residence and saw marijuana there was November 11, 1994, when they obtained from him "on consignment," one pound three ounces of marijuana. The affidavit was signed and notarized, and the search warrant was issued and executed, on November 21, 1994, 10 days after that visit. Rule 3.10, Ala. R.Crim.P., provides that a search warrant shall command the law-enforcement officer to whom it is directed to effectuate the search within a specified period of time "not to exceed ten (10) days." Here, the search was conducted on the same day the search warrant was issued, which was exactly *234 10 days from the date the students saw marijuana at Vinson's residence.
However, the currentness of the probable-cause information was "refreshed" and bolstered by the fact and content of the telephone conversation the students had with Vinson the day before the affidavit was executed. The content of that conversation would allow the judge to whom the affidavit was submitted reasonably to infer that Vinson was still actively involved in the business of "fronting" marijuana to street-level dealers and that he would be continuing in that activity through at least November 21, 1994. That information was extremely important to the "practical, common-sense decision" the issuing judge was called upon to make concerning whether there was "a fair probability that contraband or evidence of a crime [would] be found in a particular place." So were the facts that the students had been to Vinson's residence on "four other occasions where they were furnished marijuana" by him and that "they owed $2100.00 from marijuana given to them on consignment." The fact that the affidavit did not specify the time frame within which those four other consignments of marijuana had occurred does not detract significantly from the value of that information.
The issuing judge was clearly informed that Vinson had furnished marijuana to the students on five separate occasions. Given the usual age of college students, the judge could have logically inferred that they had not been engaged in receiving and selling drugs on consignment for any great length of time. He could reasonably have inferred that drug dealers operating at an upper level of the drug distribution "food chain" would not be keeping on hand only small amounts of marijuana specially procured to supply to two college students, "street-level" dealers who were taking the marijuana on consignment. The fact that the last transaction involved one pound three ounces of marijuana, and that the students still owed Vinson a balance of $2,100 from previous transactions, would provide the issuing judge with a basis for inferring that Vinson was routinely dealing in significant quantities of marijuana. The issuing judge would be entitled to infer, as "a practical, common-sense decision," that Vinson's network of dealers, whom he supplied out of his residence in Birmingham, did not consist of just two college students in Tuscaloosa. Consequently, again as a matter of allowable "common-sense" deduction and inference, the issuing judge would be warranted in concluding that Vinson was likely to have at his residence a continuing, and replenished, inventory of marijuana to provide to the students when they returned by the imposed deadline of 8:00 p.m. on November 21, 1994, with the money they owed him. Also, it must be remembered that Agent Warren laid a logical predicate for his statement that he believed that not only would Vinson be concealing a quantity of marijuana at his residence, but also that there would be located at the residence evidence of illegal drug activity through records, proceeds, and monies.
Therefore, our probable-cause analysis must relate not only to the likelihood that additional marijuana would be located at the residence, but also, and independently, to the fact that evidence of illegal drug activities, in the form of records, would be present because of the common practice, as stated in the affidavit, of drug dealers' providing their wares on consignment "to maintain books, records, receipts, handwritten notes, ledgers, and audiotape recording... for the purpose of documenting fronted controlled substances." In this case, the question is whether the law-enforcement agents had the right to enter Vinson's premises at 8:00 p.m. on November 21, 1994, for the purpose of executing *235 the search warrant, so that they were legally in his residence at the time he arrived and began to enter his residence, allowing them to observe him throw his hands in the air and drop a brown leather satchel he was carrying, and to thereafter find a handgun in the satchel and then to hear him when he "immediately began to make spontaneous voluntary statements as to where he had been and what he had been doing." It is the suppression of the handgun and of the statements Vinson made to the narcotics officers while they were in his home that was at issue before the Court of Criminal Appeals. It ruled that the trial judge's determination that "the information and warrant was stale in that the warrant was not executed within 72 hours of the alleged seeing of any controlled substance within the residence" was due to be upheld, but that his suppression of "only the marijuana, the pictures, and the pipe found in Vinson's home," without also suppressing "the gun or the statements Vinson made," was in error because once the trial judge found the search warrant "to be invalid," it followed that the officers "did not have a legal right to be in Vinson's home." 843 So.2d at 228.
Considering the "totality of the circumstances," we are persuaded that sufficient facts, and inferences reasonably and logically derivable from those facts, were presented to the issuing judge to enable him to make the "practical, common-sense decision" that there was "a fair probability that contraband or evidence of a crime" would still be present at Vinson's residence on November 21, 1994. Under all of these circumstances, we conclude that the Court of Criminal Appeals erred when it accepted the trial court's determination that the warrant was deficient because it was based upon stale information. Sgro, supra; Moore, supra. The judgment of the Court of Criminal Appeals is therefore reversed, and the cause is remanded to that court for an order or proceedings consistent with this opinion.
REVERSED AND REMANDED.[*]
HOUSTON, LYONS, BROWN, WOODALL, and STUART, JJ., concur.
MOORE, C.J., concurs in the result.
SEE and JOHNSTONE, JJ., dissent.
SEE, Justice (dissenting).
This case turns on whether the search warrant for Vinson's home was stale. "[T]he search of the appellant's residence was made pursuant to a warrant and thus is to be presumed valid. `With regard to search warrants, the general rule is that the defendant has the burden of proof in challenging the validity of the execution or service of the search warrant.'" Smith v. State, 588 So.2d 561, 577 (Ala.Crim.App. 1991) (citations omitted).
In his original trial, Vinson asserted that the warrant was stale and the trial judge determined that he had carried his burden of proving the warrant was stale. Accordingly, the trial judge suppressed all evidence found in Vinson's home, but not his oral statements and the gun found in his backpack when he returned to his home and found the police searching it. Vinson appealed to the Court of Criminal Appeals, again asserting that the warrant was stale. The Court of Criminal Appeals determined that Vinson had carried his burden of *236 proving that the warrant was stale and concluded that the other evidence obtained by police as a result of their illegal search of Vinson's home should be suppressed. The Court of Criminal Appeals therefore reversed Vinson's convictions. The majority opinion reverses the Court of Criminal Appeals, finding that the warrant used to search Vinson's home was not stale. Because I find that the warrant was stale, I dissent.
In Sgro v. United States, 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932), the United States Supreme Court spelled out the standards sufficient to support the issuance of a search warrant.
"[T]he judge or commissioner issuing a search warrant for intoxicating liquors [during Prohibition] must be satisfied `of the existence of the grounds of the application or that there is probable cause to believe their existence.' He must take proof to that end. The warrant must state `the particular grounds or probable cause for its issue....' [I]t is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time. Whether the proof meets this test must be determined by the circumstances of each case."
Id. at 210-211, 53 S.Ct. 138 (citations omitted).
The Court in Sgro determined whether a warrant that had not been executed within the 10-day time limit required by the authorizing statute could be revived by returning to the magistrate with the same information that supported the first warrant. Id. at 211, 53 S.Ct. 138. The Court stated:
"If the warrant is the old one, sought to be revived, the proceeding is a nullity, and if it is a new warrant, the commissioner must act accordingly.... The proof supplied must have appropriate relation to the application for the new warrant and must speak as of the time of the issue of that warrant. The commissioner has no authority to rely on affidavits which have sole relation to a different time and have not been brought down to date or supplemented so that they can be deemed to disclose grounds existing when the new warrant is issued."
Id. (emphasis added).
Although the State presented ample testimony at trial to support the issuance of a warrant, the only evidence of Vinson's possession of marijuana presented to the magistrate on November 21, 1994, was the affidavit of narcotics investigator Warren stating that the informants, Smith and Copper, had seen marijuana at Vinson's home on November 11, 1994, and that they had purchased marijuana from him on that date.[4] This information, without more, is not sufficient to show an ongoing enterprise such that there was probable cause to believe that Vinson would have marijuana in his home at the time the search warrant was finally executed.
An otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant, but not disclosed to the issuing magistrate. Whiteley v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); Wayne R. LaFave, 2 Search and Seizure § 4.3 (3d ed.1996). In Nelms v. State, 568 So.2d 384 (Ala.Crim. *237 App.1990), the Court of Criminal Appeals held that a deficient affidavit was not cured by admission of the police officer's oral testimony at the suppression hearing, reasoning that, although the officer's testimony at the suppression hearing included many more relevant facts than had been listed in the affidavit, it could not assume that this information was conveyed to the issuing judge. Nelms, 568 So.2d at 387. The record here provides no indication that Smith or Copper appeared before the magistrate. While the affidavit does state that "Smith and Copper further told Agent Willingham and Agent Guy Warren that they had been to Melvin Vinson's residence on four other occasions where they were furnished marijuana ...", there is no indication in the affidavit of the time frame in which these purchases occurred, or that Smith and Copper routinely received more marijuana when they paid Vinson for previous purchases. When asked what, if any, other information he might have conveyed orally to the issuing judge when he sought the warrant, Agent Warren stated "I can't rememberI don't have anything else written down." Without any indication in the record, we cannot assume that the magistrate considered any information other than that contained in Warren's affidavit when he issued the warrant. Nelms, supra. Because Warren's affidavit, by itself, did not provide sufficient information to support a finding of probable cause, I believe the Court of Criminal Appeals was correct in holding that the search of Vinson's residence was pursuant to an invalid warrant. See United States v. Hove, 848 F.2d 137, 140 (9th Cir.1988) ("[U.S. v.] Leon[, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)] does not extend, however, to allow the consideration of facts known only to an officer and not presented to a magistrate."). I must, therefore, respectfully dissent.
JOHNSTONE, Justice (dissenting).
I respectfully dissent from the main opinion of this Court and agree with the opinion of the Court of Criminal Appeals, Vinson v. State, 843 So.2d 221 (Ala.Crim. App.2000), except that I agree with the main opinion in its use of the de novo standard of review for undisputed ore tenus testimony.
NOTES
[1] This case was originally assigned to another Justice. It was reassigned to Justice Harwood on July 11, 2001.
[2] Vinson's conviction for the unlawful distribution of a controlled substance resulted in a sentence of 10 years' imprisonment upon the application of the Habitual Felony Offender Act, Ala.Code 1975, § 13A-5-9. Vinson was sentenced to an additional 10 years in prison as a result of sentence enhancements for the sale of a controlled substance within three miles of a school or a public housing project, Ala.Code 1975, § 13A-12-250 and § 13A-12-270. He was also ordered to pay $100 to the Alabama Crime Victims Compensation Commission, and was fined a $1,000 drug-user fee, that fee to be retaxed upon Vinson's completion of a drug-rehabilitation program. Vinson's conviction for the unlawful possession of a pistol by someone previously convicted of a crime of violence resulted in a sentence of 5 years' imprisonment and a $100 payment to the Crime Victims Compensation Commission. The two sentences were to run concurrently.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[*] Note from the reporter of decisions: On February 22, 2002, on remand from the Supreme Court, the Court of Criminal Appeals affirmed, without opinion. On March 22, 2002, the Court of Criminal Appeals denied rehearing, without opinion. On August 16, 2002, the Supreme Court denied the petition for certiorari review filed by Melvin Vinson, Jr., without opinion (1011315).
[4] Evidence presented at trial, but not included in the affidavit of investigator Warren, indicated that Smith and Copper had purchased marijuana from Vinson weekly between September and November and that they had a pattern of receiving more marijuana from Vinson when they paid him for past purchases.