PER CURIAM.
On January 25, 2013, the State of Alabama, through the Alabama Attorney General, filed with this Court an “Emergency Petition for Writ of Mandamus,” seeking an order directing the presiding judge of the Macon Circuit Court to issue a search warrant as to certain allegedly illegal gambling devices and related items located in a facility commonly known as Quincy’s 777 Casino at VictoryLand (“the casino”) in Shorter. On February 15, 2013, this Court, by order, granted the State’s petition and issued the writ, instructing the judge to issue the warrant. Given the *341 inherently ex parte nature of a search warrant, and in order that the purpose of the warrant to be issued not be frustrated, this Court issued the writ under seal, with instructions that the order remain under seal until further order of this Court following the execution of the warrant. The execution of the warrant having been accomplished, this Court has removed the seal from this proceeding and its February 15 order and now addresses the reasons for issuing the writ.

Procedural History

At approximately 7:15 a.m. on January-16, 2013, Howard “Gene” Sisson, who has been a law-enforcement agent for 25 years and who is a special agent with the Office of the Alabama Attorney General, approached Judge Ray D. Martin of the Fifth Judicial Circuit with an application for a search warrant to be executed at the casino. Sisson was accompanied by, among others, Jesse Seroyer, Jr., who is the deputy chief of the Investigative Division in the Office of the Alabama Attorney General. According to affidavits submitted to this Court by Sisson and Seroyer, Judge Martin declined to issue the warrant on the ground that, as of midnight, approximately seven hours earlier, he was no longer the presiding judge for the Fifth Judicial Circuit of Alabama, within which Macon County is located, and that Judge Thomas F. Young, Jr., had, as of that time, assumed the position of presiding judge. According to the affidavits, Judge Martin further stated that he had been assigned responsibility for Chambers County, another county located within the Fifth Judicial Circuit, and therefore no longer had authority to issue a search warrant to be executed in Macon County.[1] Judge Martin directed Sisson to Judge Young.
Sisson approached Judge Young with the application for a search warrant later that same day. In support of the application, Sisson presented a 13-page affidavit, to be sworn to and executed by Sisson, as the affiant, and a January 7, 2013, surveillance video of alleged illegal gambling operations at the casino. Sisson’s affidavit states, in pertinent part:
“I have a working understanding of the gambling laws of the State of Alabama and have obtained formal training within the past 18 months on the identification of slot machines and gambling devices. I have also read Macon County’s Bingo amendment. I have witnessed the formal playing of the game commonly known as Bingo in establishments in Montgomery and have worked in an undercover capacity at Center Stage in Cottonwood, Alabama and Southern Star in White Hall, Alabama. As a private citizen, I have played and witnessed the playing of traditional slot machines in Biloxi, Mississippi; Shreveport, Louisiana; and Las Vegas, Nevada. I have participated in four search warrants executed at businesses that *342 promoted and facilitated what was advertised as electronic bingo. Furthermore, I have successfully obtained a search warrant for Center Stage, Cottonwood, Alabama and executed the same on July 25, 2012.
[[Image here]]
“On December 20, 2012, two days after the Casino announced its opening, an undercover officer entered the premises while equipped with a device to record both audio and video evidence of his visit. For the purpose of this affidavit, this officer will be referred to as Undercover 1 (UC 1)....
[[Image here]]
“On December 20, 2012, UC 1 entered the Casino after he was issued U.S. currency from [the Attorney General’s] office. He was required to approach a bank of cashiers after entering where he had to present identification before he could be issued a player’s card. That card identified the Casino and had the UC’s name embossed on it. UC 1 handed the cashier the U.S. currency to have it applied to his account which could be accessed with the player’s card. Furthermore, he was required to create a PIN number that was required to be used after the card was swiped at the various slot machines.
“UC 1 first approached a machine titled ‘Super Fruit.’ On video, it was obvious he swiped his player’s card but could not get the machine to play. After asking for assistance from an employee, he tried again at a machine named ‘Classic Reels.’ He was successful in entering a PIN after swiping his card on that machine.
“The main display on the video screen was predominantly covered by a large, digital representation of ‘reels’ commonly seen on casino slot machines. There were five vertical reels with three positions always visible per reel. When UC 1 pressed the ‘Play’ button, the positions on the reels appeared to rotate vertically at a speed faster than my mind or eye could comprehend for approximately four seconds. In a small section in the top left portion of the screen, there was a small grid consisting of five vertical by five horizontal rows. That grid was the same approximate size as one section of one spinning reel. To the right of that grid were three horizontal lines that rapidly filled with numbered circles in two rows of 15 numbers and one row of four numbers. The total width of the small grid and accompanying rows was approximately as wide as two of the five spinning reels. The height remained constant as the approximate size of one position on the reels.
“On the player’s console were numerous illuminated buttons. Most, from the left to the center, determined the amount a player could wager. There were other buttons for assistance and for a winning conversion chart for the items displayed on the reels. The largest button was a circular ‘Play[1] button. Other than occasionally changing the amount of his wager, this was the only button UC 1 had to press to play a game cycle. Upon pressing it, the reels would spin, numbered circles would fill the small horizontal rows at the top and a game cycle would be played. If numbers in those horizontal rows matched any numbers in the small playing grid in the left uppermost portion of the screen, some correlation would be made among the symbols when the reels stopped. Lines traversing in numerous directions would connect various points on the reels with other points to indicate some type of winning pattern. In the event a winning pattern occurred, a representation of increasing amounts of currency *343 would be added digitally to the player’s account and the increase could be monitored on the player’s screen. While UC 1 never attempted to present his player’s card to a cashier to obtain the currency that remained in his account, an undercover agent (UC 3) on a later visit did, in fact, receive currency from the cashier after swiping his player’s card and providing his PIN.
“In the event a game cycle was won, a predetermined amount of winnings, based upon the pattern, would be added to the player’s account. It was not required for UC 1 to press any other button or tab to collect his winnings or to identify matching patterns. The machine performed that task for him. All he was required to do was simply press ‘Play’ again to begin the next game. It was possible to touch the screen in the lower right corner to initiate ‘Play’ but, again, that was the only tab necessary to touch. At one point, UC 1 ran his finger over different areas of the reels with no effect.
“During this visit, UC 1 also played a game titled ‘Wild Harvest.’ Game initiation and play was the same as described above. The format of the screen was also similar other than the graphics were different. While moving through the Casino, UC 1 identified other titles such as ‘Cherries Wild’ and ‘Fun Fruit’ but did not approach them to play.
“Finally, UC 1 approached a game that had a large ‘Gateway’ sign on the lower panel of the machine. The game was titled ‘Black Dog1 and operated in much the same way as the other non-Keno games. It, too, was mostly differentiated by graphics alone. The five by five grid normally located in the top left corner of most games played, however, was in the lower right of this game. While the camera angle was not ideal, I could not locate a section that displayed any numbered circles like those that appeared in horizontal rows in most other machines at the Casino. Furthermore, the size of this particular miniature grid was roughly equal to the size of one position on any one of the positions on a single reel.
“On January 7, 2013, your Affiant directed two additional undercover agents, hereinafter, referred to as UC 2 and UC 3 to enter the Casino with covert video and audio recorders in order to capture their visit....
[[Image here]]
“After following the same procedure [as UC 1] for obtaining players’ cards and placing money in their accounts, the UC’s worked together and first approached a game titled ‘Crimson Seven.’ Both UC’s recorded different angles of their experience while playing the slot machines. ‘Crimson Seven’ consisted of a main display that was predominantly covered by a digital representation of spinning reels. As described earlier when noting UC l’s play, it consisted of five vertical reels aligned side by side with three positions displayed on each reel. When the ‘Play’ tab or button was pushed, the reels appeared to rotate vertically at computer speed.
“When a game cycle was over and a winning pattern was predetermined and illuminated by the computer, the UC’s merely had to press play again to begin the next game. At no time were they required to ‘daub’ any number or pattern and they never had to ‘claim’ any prize. The computer simply identified the winning patterns, credited or debited their accounts as appropriate, and prompted the players to press play again to begin the next game.
“All total, UC 2 and UC 3 played thirteen different games in the Casino. *344 They were titled ‘Crimson 7’; ‘Cash Cow’; ‘Super Seven’; ‘Cherries Gone Wild’; ‘Lucky Charms’; ‘Hotter Than’; ‘Lucky Fruits’; ‘Texas Gold’; ‘Reel Cats’; ‘Paydirt’; ‘Lucky Duck’; ‘Wild Billy’ and ‘Bustin’ Vegas.’ Each of those machines operated in much the same manner as those previously described. Differences in graphics were evident in each and the five by five grid was often located in a different section of the screen. In each game, however, that grid was considerably smaller than the spinning reels that dominated the screen. None of the games required any additional action from the player other than to hit ‘Play1 again to begin another game. The duration of the games varied from approximately 2.25 seconds to as long as approximately 5.4 seconds. On video, some bonus rounds appeared to last even longer in what your Affiant believed was an attempt to build suspense with regard to potential winnings.
“One game, ‘Lucky Fruits’ played by UC 2 and UC 3, was slightly more different visually than the other games. In this format, the spinning elements consisted of three vertical reels with three positions on each reel. It was possible for UC 2 to press each position of the spinning reel to stop the reel at that position. That action indicated each reel was not spinning separately as a unit. Rather, it appeared as though each position on each reel was spinning as a unit unto itself. Regardless, each position was spinning more rapidly than the mind or eye could comprehend. It was also possible to allow the machine to continue playing on its own without additional player interaction. In that case, the game lasted approximately 5.4 seconds. As an alternate method, the player could press the ‘Stop’ button and all appearances of spinning on the reels stopped simultaneously. UC 2 said in each instance the positions were changing far too quickly for the human mind to recognize the patterns.
“Some games even provided bonus rounds during which zero input was required from the player. The UC simply sat in front of the machine and game cycles were completed without any required interaction. At one point, UC 3 reached a bonus round while he was engaged in conversation with an employee who explained, when asked, that a bonus round had occurred. Prior to the commencement of this undercover mission, I asked UC 3 if he could present his player’s card to a cashier prior to departing the casino to determine if money left on his account would be given to him. He was not required to present identification to successfully complete this task and was given the amount of money that corresponded to the amount listed in his account on the last machine he played.
“As noted earlier, I did visit the Casino on January 15, 2013, prior to presenting this Affidavit to the Court for consideration. After experiencing the same process as the earlier agents whereby a player’s card is issued, I proceeded to various machines to observe the workings of devices similar to what I witnessed on earlier undercover videos. While I did not play the number of machines as UC 2 and UC 3, I did gamble on a representative sample to insure my understanding of what I had seen on video and what the agents had relayed to me was fully understood. During my visit to the Casino, I noticed nothing to indicate anything about the Casino or its operations had changed since the earlier agents reported. In the end, like UC 3, I cleared out the account of my player’s card to verify the *345 currency I received matched the dollar amount displayed on the last machine I played.
“It should be noted that during my visit, I made a particular point to locate and play a game played by UC 1 on his first visit titled ‘Super Duper Ball.’ On video during UC l’s visit, he engaged an employee in conversation about a particular bank of machines and whether they were operational. The employee described the game as ‘Keno’ and mentioned the Casino had six such machines. The name affixed to the front of the machine, however, said ‘Super Duper Ball.’ From UC l’s video, it appeared as though once the player card was swiped and the PIN number correctly entered, the player had a choice of playing six different games on a single machine.
“As the employee was explaining the game to UC 1, he mentioned the player had a choice of choosing his numbers or he could elect to have the machine ‘auto pick’ them for him. The particular game UC 1 played had the wording ‘Beat The House’ across the digital screen. I chose a title similar to ‘Hillbilly Girls.’ The screen consisted of eight horizontal rows with ten numbers on each row that appeared in numerical order. When play was initiated, approximately 20 rapidly appearing numbered spheres fell on the screen faster than the mind or eye could comprehend in two vertical columns. The player had a choice of two speeds that the numbered spheres could fall. The slow speed lasted approximately 2.5 seconds while the faster speed appeared to last less than one second.
“Prior to play, the player was prompted to pick two to eight numbers from the 80 numbers in the center. Like UC 1, however, I elected to allow the machine to pick the numbers for me. The object then became to have a numbered sphere among the 20 that fell in the two vertical columns match one or more of the numbers picked among the 80. I played five games in this fashion before I finally noticed a five by five grid, similar to the small grids described in other games, which flashed in the lower right portion of the screen only as long as it took the numbered spheres to fall. Once those spheres were in place, the grid disappeared. On either speed, fast or slow, I could not comprehend with any meaning what numbers were located where on that grid. Since the object of the game was matching numbers one through eighty on the main display with the numbers that fell vertically, I saw no correlation to that five by five grid.
“Based upon my experience and understanding of [§ ] 18A-12-20(10), [Ala. Code 1975,] each machine observed by the UC’s at the Casino met the definition of a slot machine:
“ ‘SLOT MACHINE. A gambling device that, as a result of the insertion of a coin or other object, operates, either completely automatically or with the aid of some physical act by the player, in such a manner that, depending upon elements of chance, it may eject something of value. A device so constructed or readily adaptable or convertible to such use is no less a slot machine because it is not in working order or because some mechanical act of manipulation or repair is required to accomplish its adaptation, conversion or workability. Nor is it any less a slot machine because apart from its use or adaptability as such it may also sell or deliver something of value on a basis other than chance.’
“After establishing an account represented by a player’s card and PIN, playing these machines required the player to insert that PIN into the machine after *346 swiping the player’s card. The player then initiated play by a physical act. Each separate game cycle the UC played operated strictly by chance without any reliance upon the player’s skill or potential mastery of play and relied solely upon the chance that the computer would match numbers that filled or appeared in small grids or columns/rows with any number located anywhere on the small, five by five grid. The player did not even need to understand or remember winning patterns since the computer recognized the patterns and alerted the player of the results. In every discernible winning event, those machines then transferred monetary credit into the player’s account. Those winnings or remaining credit in the player’s account could be collected from the cashier by presenting the player’s card and PIN to a cashier.
“Furthermore, it is my opinion the machines inside the Casino fit the description of a Gambling Device as outlined in [§ ] 13A-12-20(5)[, Ala.Code 1975]:
“‘GAMBLING DEVICE. Any device, machine, paraphernalia or equipment that is normally used or usable in the playing phases of any gambling activity, whether that activity consists of gambling between persons or gambling by a person involving the playing of a machine. However, lottery tickets, policy slips and other items used in the playing phases of lottery and policy schemes are not gambling devices within this definition.’
“At this Casino, the monitors, devices and their servers are usable in the playing phases of a gambling activity. Specifically, those monitors, devices and servers allowed the UC to risk something of value (State issued United States currency) on the outcome of a contest of chance (random matching of computer generated numbers to a five by five grid which occurred purely by chance instead of upon any skill, whatsoever, by the player) on the understanding that he might receive something of value in the event of a certain outcome (winnings that could be obtained from the cashier in exchange for his PIN slip). Each and every time any of the UC’s pressed or touched ‘Play,’ currency or credit was debited from their accounts. In the event of a winning pattern, money or credit was returned to their accounts. The amount wagered was determined by the player prior to the initiation of a game. Unless a player decided to alter that amount, the setting of the wager amount remained constant until the player elected to change the amount.
“Because the Casino purports that [its] games are forms of electronic BINGO, I cite now the section of the Alabama Supreme Court’s [Barber v.] Cornerstone [Community Outreach, Inc., 42 So.3d 65 (Ala.2009),] decision which so clearly defined the game commonly known as BINGO.
“ ‘The characteristics of [bingo] include the following:
“ ‘1. Each player uses one or more cards with spaces arranged in five columns and five rows, with an alphanumeric or similar designation assigned to each space.
“ ‘2. Alphanumeric or similar designations are randomly drawn and announced one by one.
“ ‘3. In order to play, each player must pay attention to the values announced; if one of the values matches a value on one or more of the player’s cards, the player must physically act by marking his or her card accordingly.
*347 “ ‘4. A player can fail to pay proper attention or to properly mark his or her card, and thereby miss an opportunity to be declared a winner.
“ ‘5. A player must recognize that his or her card has a “bingo,” i.e., a predetermined pattern of matching values, and in turn announce to the other players and the announcer that this is the case before any other player does so.
“ ‘6. The game of bingo contemplates a group activity in which multiple players compete against each other to be the first to properly mark a card with the predetermined winning pattern and announce that fact.’
“[42 So.3d at 86.]
“In the game commonly known as bingo, alphanumeric pairings such as B15, 125, N61, etc., are announced one by one. In my example in the previous sentence, if B15 is announced by the caller, the number 15 can only be properly ‘daubed’ if it appears somewhere in the vertical column under ‘B.’ If 15 appears in the ‘O’ column and the player ‘daubs’ 15 in the ‘O’ column, it will be considered incorrect and cannot be attributed toward a winning pattern. On the machines the UC’s played and witnessed at the Casino, the numbers simply had to exist somewhere on the five by five grid without regard to column, order, alphanumeric or similar designation.
“Regardless of the method the numbers appeared in the current gaming systems at the Casino, they seem to be randomly drawn and did not repeat themselves in such a way that could be readily distinguished. Their order of draw, appearance or location in their respective filling grid or columns had no bearing on a matching number on the small, five by five playing grids. Furthermore, those drawn numbers have no alphanumeric or similar designation. They are simply numbers and are not announced in any way to the players. On the machines at the Casino, all of the appearing or drawn numbers appear in a matter of seconds which is in contrast to the traditional game of bingo where the announcement of alphanumeric pairings occurs at a slow enough cadence to allow a player to understand the pairing called and then look for a proper match on any of his cards before the next pairing is called. In the traditional playing of bingo, a player’s skill and ability to scan multiple cards in search of the called pairing becomes a factor. The more cards a player purchases in a traditional game gives him more opportunities to be the first among his competitors to recognize and announce a winning pattern. A lack of skill in scanning multiple cards or any lapse of attention could cause a player in a traditional game of bingo to miss a matching announced pairing. At the Casino, the computer highlights the ‘matching’ numbers for the player by means of visual association with the decorative spinning reels which completely eliminates any chance a more skilled or alert player could have an advantage.
“There was no need for attention to be paid by the UC’s nor by any other players they observed to the numbers announced since none were announced. Although the numbers on the machines at the Casino are displayed, they appear at computer speed and the player is afforded no opportunity to match the numbers on his own. The player is simply bypassed in that the computer identifies the matching numbers and pattern and then forces the player to accept the computer’s recognition of winning patterns.
*348 “In the event a winning pattern is present, the computer determines, and without input from the player, that the player is a winner simply by highlighting the winning pattern for him through some representation on the reels after they stop spinning. There is no opportunity to recognize and ‘daub’ any area of the entire screen. There is no chance something of value from that winning game will not be transferred or ejected into the player’s account. At no time during any of the UC’s actual play were they compelled to compare the numbers in the area where numbers appeared or filled to the playing grid to insure the numbers matched.
“The rules of play at the Casino had no requirement that the UC’s or any other player were required to announce, or otherwise make known, to any other player or employee that he/they had won a game. Furthermore, there was no indication they were competing with any other player to be the first to do so. At no time were the UC’s prompted to speed up their claiming of a prize. First, there was no requirement to claim any prize. Second, the UC’s allowed sufficient time to elapse in order to learn if, like some other slot machines in some other casinos, the server would attempt to speed up subsequent games played by the patrons by alerting them to a timed countdown before they lost any winnings.
“Based upon the observed facts outlined by me in this Affidavit on the established dates and also upon my training, experience and understanding of the gambling laws of the State of Alabama, I do assert the State of Alabama has probable cause to believe that illegal slot machines and gambling devices are currently present within [the casino].”[2]
According to Sisson, he submitted the affidavit to Judge Young, along with, among other things, a photograph of the casino and a video recording containing highlights from the surveillance video mentioned in the affidavit. Sisson also offered to provide the entire surveillance video immediately if necessary. This Court has viewed the video recording that was submitted to Judge Young. This recording fully and clearly corroborates the description in Sisson’s affidavit as to the nature of the machines alleged to be illegal gambling devices and the manner in which those machines are “played.”
Judge Young denied the State’s application for a search warrant. In an affidavit attached to the State’s petition to this Court, Sisson stated:
“[The judge] gave two reasons for his refusal to sign. First, he said that the Alabama Supreme Court’s decision in the [Barber v.] Cornerstone[, 42 So.3d 65 (Ala.2009),] case was not clear and did not assist him in determining if the Vic-toryLand machines were legal or not. Second, he noted the conflict between two law enforcement agencies regarding the legality of the machines. He explained that the Sheriff of Macon Coun *349 ty had certified the machines as legal, but now the Attorney General was claiming the same machines were illegal.”
After Judge Young denied the application for the search warrant, the State filed a petition for a writ of mandamus with the Court of Criminal Appeals seeking an order directing Judge Young to issue the warrant. Judge Young filed a letter in response to the State’s petition, stating:
“After reviewing the affidavit in support of the search warrant and viewing video evidence, this Court respectfully declined to issue the search warrant. I informed the investigators for the Attorney General’s Office that I felt their affidavits were inadequate given the fact that another law enforcement official, Sheriff of Macon County, had publicly declared the same machines, which the Attorney General deemed illegal, to be legal. I also discussed the matter that the Sheriff along with an expert for Victoryland declared publicly on television that these machines complied with the six-point test as set out in [Barber v.] Cornerstone[, 42 So.3d 65 (Ala.2009) ]. Therefore, I did not find that the affidavits or video evidence supporting this search warrant to adequately establish probable cause that a crime was being committed. The Court at that time discussed the analogy of two law enforcement officials approaching a Judge for the purpose of a search warrant where one said that there was cocaine in a residence and the other said that the substance was not cocaine. A search warrant is an extraordinary writ and the Judge issuing said warrant should be soundly convinced of an illegal activity. In the instant case, given the fact that [Amendment No. 744, Alabama Constitution 1901, now Local Amendments, Macon County, § 1 (Off.Re-eomp.),] which provides for bingo being played at Victoryland allows the Sheriff to make a determination as to the nature of the bingo, and further, given the fact that he has publicly declared the machines presently located at that location to comply with the Supreme Court guidance in Cornerstone, there is clearly a lack of sufficient probable cause to warrant such an extraordinary writ. I urge this Court not to get caught up in the politics of our public officials or the gaming industry, but look deeply into what is necessary in order to fairly administer the laws of this country. If the Petitioner in this case succeeds, then it will put Judges of this State in the untenable position of determining which constitutional officer they choose to believe.
“The Petitioner, in fact, is asking this Judge to sign an Order whereby he declares these machines to be illegal, when there has been no such decision on this issue by any Court. If these machines were of such an illegal nature, as cited in the extensive brief of the Attorney General, then why does the Attorney General need a warrant? This business is for public invitees and a search warrant would not be required if these machines were in plain sight and illegal.”
Without giving any reason in its order, the Court of Criminal Appeals denied the State’s petition. The State then petitioned this Court for the writ of mandamus.

Analysis

Before addressing Judge Young’s reply to the petition before this Court, we note that nothing in Sisson’s affidavit describing the reasons Judge Young gave at the time for denying the search warrant and nothing in Judge Young’s response to the State’s petition in the Court of Criminal Appeals makes any mention of any concern as to Sisson’s credibility as an affiant *350 in support of the application for the search warrant or the accuracy of the surveillance video submitted to Judge Young. In the Court of Criminal Appeals, Judge Young defended his denial of the State’s warrant application on purely legal grounds. Primary among these grounds was the fact, according to Judge Young’s submission to this Court, that Macon County Sheriff David Warren had “publicly declared on television” that the machines at Victory-Land were legal.[3] Judge Young (sometimes referred to hereinafter as the “the trial judge”) also took the position that no probable cause could exist where two law-enforcement officials disagree over the legality of the alleged contraband that is the subject of the application for a search warrant.
In his reply to the State’s petition filed with this Court, Judge Young restates the positions he took before the Court of Criminal Appeals, but for the first time now includes statements from which one might infer that there could have been a problem with Sisson’s credibility or the accuracy of the surveillance video.[4] These comments come only after the State, in the Court of Criminal Appeals and again in their initial filing in this Court, seized upon the fact that the trial judge had expressed no doubt about “the credibility of the affi-ant and his proposed testimony, the accuracy of the video or the sufficiency of the evidence.” Even in these comments (see note 4 accompanying this paragraph), Judge Young stops short of actually saying that, in fact, he found Sisson to lack credibility. Moreover, he offers no reason why this might be the case. Likewise, he stops short of asserting that the surveillance video is inaccurate. Thus, we have before us only mere suggestions of possibilities not previously tendered. This belated proffer, such as it is, does nothing to deter this Court from the conclusion reached in issuing the writ of mandamus that, based on the errors of law described in his submissions to the Court of Criminal Appeals and to this Court and the other circumstances presented (see discussion infra), Judge Young acted outside the discretion afforded him by law when he denied the State’s request for a search warrant in this case.
Given the lack of any reason to suspect the credibility or accuracy of the evidence tendered to the trial judge, we apply the same evidentiary standard applied in cases such as Vinson v. State, 843 So.2d 229, 231-32 (Ala.2001), a case in which this Court issued a writ of mandamus reversing a decision of the Court of Criminal Appeals requiring suppression of evidence obtained pursuant to a search warrant:
“The evidence presented at the hearing on Vinson’s motion to suppress consisted of the testimony of the officers who executed the warrant. That evi *351 dence was undisputed. Accordingly, we review the trial court’s decision to grant the motion to suppress under a ‘de novo’ standard of review. Ornelas v. United States, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); State v. Hill, 690 So.2d 1201 (Ala.1996); and State v. Smith, 785 So.2d 1169 (Ala.Crim.App.2000). We apply this standard to the general question whether the affidavit of Agent Guy Warren was sufficient to supply probable cause to issue the warrant.”
See also State v. Hill, 690 So.2d 1201, 1203-04 (Ala.1996) (reversing a suppression order and noting that “[t]he trial judge’s ruling in this case was based upon his interpretation of the term ‘reasonable suspicion’ as applied to an undisputed set of facts; the proper interpretation is a question of law”). Similarly, various federal courts have held that whether the facts contained in a search warrant are sufficient to establish probable cause of a federal crime is a question of law, subject to de novo review. See United States v. Bradley, 644 F.3d 1213, 1263-64 (11th Cir.2011).
In addition, because, as in Vinson, this matter comes to us by way of a petition for a writ of mandamus, we are mindful that such a writ will be issued only where there is
“(1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court.”
Ex parte Integon Corp., 672 So.2d 497, 499 (Ala.1995).
It is well settled that
“[a]s a general rule a writ of mandamus will not issue to review an exercise of judicial or quasi judicial discretion....
“This rule, however, has an exception in this jurisdiction, for in some cases the writ of mandamus has been employed to correct errors of inferior tribunals, and to prevent a failure of justice where there is a clear right and there is an absence of any other adequate remedy, and it has also been employed to prevent an abuse of discretion, or to correct an arbitrary action outside of the exercise of a reasonable discretion.”
Foshee v. State, 210 Ala. 155, 156-57, 97 So. 565, 566 (1923) (emphasis added) (quoted with approval in Ex parte Brookwood Med. Ctr., 994 So.2d 264, 268 (Ala.2008) (writ of mandamus may be issued “‘to prevent an abuse of discretion, or to correct an arbitrary action outside of the exercise of a reasonable discretion’ ”)).
Also, this Court has noted:
“[M]andamus ‘is appropriate in exceptional circumstances which amount to judicial usurpation of power.’ [Ex parte ] Nice, 407 So.2d [874,] 878 [ (Ala.1981) ] (emphasis omitted). Moreover, ‘mandamus can be used to prevent a gross disruption in the administration of criminal justice.’ Nice, 407 So.2d at 879 .... Thus, when the trial court has acted without lawful authority, the State has been afforded mandamus relief. See, e.g., State v. Blane, 985 So.2d 384 (Ala.2007) (directing circuit court to vacate order expunging criminal record); D.B.Y. v. State, 910 So.2d 820 (Ala.Crim.App.2005) (directing trial court to reinstate juvenile’s probation and direct that juvenile undergo sexual-offender risk assessment before being released from probation).”
Ex parte King, 23 So.3d 77, 79 (Ala.2009) (emphasis added); see also State v. Fowler, 32 So.3d 21, 26 (Ala.2009) (“[T]he trial court’s order requiring the State to produce its witness list for trial and a summary of each witness’s testimony will *352 result in a gross disruption in the administration of justice.”); State v. Blane, 985 So.2d 384, 386 (Ala.2007) (‘“When we consider a mandamus petition, the scope of our review is to determine whether the trial court clearly exceeded its discretion.’ ‘Mandamus is an extraordinary remedy, but is appropriate in exceptional circumstances which amount to judicial usurpation of power.’ Moreover, we have recognized that ‘mandamus can be used to prevent a gross disruption in the administration of criminal justice.’” (citations omitted)).
As one well known treatise explains:
“Mandamus lies to compel a judge to issue a warrant of arrest in a criminal case where it is the judge’s duty to do so, but not where this would be to control the judge’s discretion, unless such discretion is grossly abused.”
55 C.J.S. Mandamus § 143 (2009) (footnotes omitted; emphasis added).
Cases both within and without Alabama make clear that a court considering the issuance of a warrant acts outside its discretion when it denies the warrant based on an improper or erroneous legal ground. This Court long ago held that a writ of mandamus may be used to require the issuance of a warrant under such circumstances.
In Benners v. State ex rel. Heflin, 124 Ala. 97, 26 So. 942 (1899), this Court held that mandamus will lie to compel the issuance of an arrest warrant where the magistrate refused to issue the warrant based only upon the supposed invalidity of a statute. Benners is thus similar to the present case in that both involve a legal question as to what conduct is prohibited under extant law.[5] The Court in Benners explained the availability of mandamus as follows:
“Mandamus as a remedy is available in criminal as well as in civil cases. While it will not ordinarily in either case be used to direct a judicial officer how to act in the performance of discretionary judicial functions, it will lie to set in motion the performance of official duties, whether they be judicial or ministerial. So it lies to compel an inferior court to proceed with a criminal trial or proceeding of which the court has wrongfully declined jurisdiction and to compel an officer charged with the duty to take cognizance of a criminal charge preferred by affidavit, and thereon to issue his warrant of arrest .... The affidavit is regular in form, and full in substance. When made, it became the duty of the justice to issue his warrant of arrest, returnable as provided by the act of February 9,1895 (Acts 1894-95, p. 498).
“There was no error in the judgment awarding the writ of mandamus, and it will be affirmed.”[6]
*353 124 Ala. at 101-02, 26 So. at 943-44 (emphasis added).
Ex parte United States, 287 U.S. 241, 53 S.Ct. 129, 77 L.Ed. 283 (1932), also involved legal error by a trial court in refusing to issue a warrant. The United States Supreme Court held that mandamus will lie to compel a district court judge to issue a bench warrant where it had refused to do so despite the fact that an indictment had been issued. Because the indictment “conclusively determines the existence of probable cause for holding the accused to answer,” the authority to issue the warrant does not “carry with it the power to decline to do so under the guise of judicial discretion.” 287 U.S. at 250.
In Marshall v. Herndon, 161 Ky. 232, 170 S.W. 623 (1914), the Kentucky Supreme Court likewise considered a trial court’s refusal to issue a warrant based on an improper legal ground. Similar to the error in Benners, the error in Marshall concerned whether the challenged conduct was prohibited by a viable criminal statute. As in the present case, there was no dispute as to the facts; the only question was the purely legal one — whether there was in place a statute that made the suspect’s conduct a crime. The Kentucky Supreme Court’s analysis, which begins by noting a Kentucky statute similar to Rule 3.8 and Rule 3.9, Ala. R.Crim. P.,[7] is helpful:
“Section 31, Criminal Code, is as follows:
“‘A magistrate shall issue a warrant for the arrest of a person charged with the commission of a public offense, when, from his personal knowledge, or from information given to him on oath, he shall be satisfied that there are reasonable grounds for believing the charge.’
“This section makes it the imperative duty of the magistrate to issue a warrant whenever he shall he satisfied, from the information given him on oath, that there are reasonable grounds for believing the charge. The question before the magistrate at this time is not whether accused is guilty or should be convicted. Such matters as guilt and conviction are presented to him for judicial determination, when the accused is arrested and brought before him for trial. In this case, it is unnecessary to go into the question whether, under the Code section, supra, the magistrate acts judicially or ministerially. The question is not now before us whether it is a judicial function to determine whether the affidavit is sufficient.
“In this case the police judge, who is the magistrate, admits that the affidavit is sufficient, and that he is satisfied, from the information contained therein, that the offense has been committed, if there is a valid city ordinance covering the subject. From the record before us, it is equally apparent that there is a valid city ordinance. The petition alleged that fact. The lower court permitted Lyon [the subject of the warrant] to come into the action, and by amended answer he says that the ordinance has been repealed and is no longer in force. By reply, Marshall denied that the ordi *354 nance had been repealed. With the issue thus joined, the burden was upon Lyon to prove the repeal, and, when he failed to introduce any evidence, his contention must fail. Where it is admitted that the facts shown in the affidavit are sufficient to constitute an offense against a valid city ordinance, then certainly no discretion is left to the magistrate. The Code says that he shall issue the writ. Mandamus will lie to compel an inferior tribunal to act, but not to control its judgment....
“Since the pleadings show that there was a valid city ordinance on the subject, and it is admitted that the affidavit was sufficient, we think it was the duty of the magistrate to issue the warrant, and, upon refusal to act, he can he compelled to do so by mandamus, and on this state of facts the lower court erred in dismissing the petition.”
161 Ky. at 234, 170 S.W. at 624 (emphasis added).
Likewise, in State v. Viatical Services, Inc., 741 So.2d 560 (Fla.Dist.Ct.App.1999), there was no dispute as to the applicable facts. The Florida District Court of Appeal held that the trial court had committed legal error in declining to issue the search warrant by improperly allowing other considerations to override the existence of probable cause. Treating a petition for a writ of mandamus as a petition for the writ of certiorari, the Florida appellate court ordered a trial court to issue a search warrant that had been denied:
“Pursuant to State v. Pettis, 520 So.2d 250, 253 (Fla.1988), we may entertain state petitions for certiorari from pretrial orders in criminal cases. Here there is no remedy to the state by appeal from the denial of a search warrant. Irreparable harm is shown because the state has been precluded from obtaining information connected with a criminal investigation where the court found probable cause for the issuance of the warrant. Thus, if the state shows a departure from the essential requirements of law, a writ should issue. What the trial court has done in effect is to suppress evidence prior to its seizure by a pre-seizure hearing. We frequently review suppression orders where the court has suppressed evidence in a post-seizure hearing. Review of such pretrial order is appealable. See Fla. R.App. P. 9.140(c)(1)(B). Because the state has no similar remedy from this pre-seizure hearing, we review it by certiorari.”[8]
741 So.2d at 562 (emphasis added).
Finally, we find noteworthy the observations by one commentator based on his review of the cases:
“The few cases on the issue hold that a judge has a ‘ministerial’ duty to issue a warrant after ‘probable cause’ has been established [by the grand jury’s issuance of an indictment].... In other settings as well, reviewing courts have ordered warrants to issue when a magistrate refused to do so on a ground that was extrinsic to probable cause, such as his belief that his term of office had expired, or that the statute allegedly violated was unconstitutional. ”
Abraham S. Goldstein, The Search Warrant, the Magistrate, and Judicial Review, 62 N.Y.U.L.Rev. 1173, 1196 (1987) (emphasis added). Cf. State ex rel. Umbreit v. Helms, 136 Wis. 432, 118 N.W. 158 (1908) (under its general supervisory powers, state supreme court had the power to com *355 pel a trial court to proceed with the trial in a criminal case after the lower court quashed a good complaint upon the purely legal ground that the acts complained of did not constitute an offense).
Sisson’s affidavit submitted with the State’s petition and Judge Young’s submissions indicate that the decision not to issue the warrant in this case was premised on numerous grounds that were in error and that were extrinsic to a proper determination of probable cause.
First, reliance upon another public official’s opinion as to what is and what is not a crime under applicable law is an erroneous ground for denying a search warrant. The decision as to what activity is and is not prohibited by a criminal law is a legal one for the judiciary.
The totality of Judge Young’s submissions clearly indicate that he simply adopted the legal conclusion of Sheriff Warren, i.e., Judge Young took the position that whatever Sheriff Warren had declared to be legal under criminal statutes and the constitutional amendment applicable to bingo in Macon County is legal. On such matters, however, the law is well settled: it is a judge’s duty to acknowledge what the law is and to decide how it applies to the facts before him. See Marbury v. Madison, 5 U.S. (1 Cranch) 187, 177, 2 L.Ed. 60 (1803) (“It is emphatically the province and duty of the judicial department to say what the law is.”); see also Smith v. State, 51 Ala.App. 349, 351, 285 So.2d 512, 514 (1973) (“In the issuance of a search warrant, a judicial determination (as distinguished from executive) of probable cause is necessary.”).
It follows from the position articulated by Judge Young that Sheriff Warren would be the sole decision-maker as to whether the electronic gambling machines in the casino constitute the game of bingo. Sheriff Warren’s opinion is, according to Judge Young, binding not only on that trial judge, but also on all other law-enforcement officers, even those who are above Sheriff Warren within the hierarchy of the executive branch of government. Such a position is contrary to a proper understanding of the separation of powers between the executive branch and the judicial branch, see Ala. Const.1901, § 43, and to the provisions governing the power of the office of Attorney General. See Ala. Code 1975, § 35-15-1 et seq.
Second, there is the fact, according to Judge Young’s submissions, that he relied upon information as to Sheriff Warren’s position and the position of a purported expert on gaming machines hired by “VictoryLand,” as “declared on television.” Even had it been proper for the trial judge to rely on the opinion of other parties as to what the criminal law does and does not prohibit, the information “publicly declared on television,” upon which the judge professed reliance, was not properly before him in this case.
Third, Judge Young states that his refusal to issue a warrant is justified on the ground that two different people are telling him two different things, insisting that under such circumstances “there is certainly a dispute as to the facts.” This approach misapprehends the difference in a “fact” and a “legal” conclusion. There is no dispute at this juncture as to the facts of how these machines operate. The dispute between the attorney general and the sheriff at this juncture concerns what the criminal statute does and does not prohibit given the Constitution’s legalization of the game of bingo. This is a legal question for the judge to decide, regardless of how many different opinions might be present ed to him.
*356 Further, Judge Young complains that judges should not be put “in the untenable position of determining which constitutional officer they choose to believe” while he was simultaneously accepting the opinion of Sheriff Warren over the opinion of the attorney general. There is an obvious and inherent contradiction in this position.
Fourth, there is some evidence indicating that Judge Young expressed the view in denying the warrant that the so-called “Cornerstone test” is not clear and therefore provided no guidance to him. See Barber v. Cornerstone Cmty. Outreach, Inc., 42 So.3d 65, 86 (Ala.2009). Such a premise for Judge Young’s denial of the warrant would conflict with his clear reliance upon a sheriffs opinion that, according to Judge Young, was itself based on the “Cornerstone test.” Moreover, that test, which refers to the game commonly and traditionally known as “bingo” and then describes further elements of that game, is more than clear enough to serve as guide in measuring the facts of this case.[9]
In addition, to the extent the trial judge was deterred by the perceived lack of clear precedent to guide him, this too was error. Lack of preexisting appellate court precedent does not relieve a judge of the task of reading and determining the legal meaning of constitutional provisions and statutes.
Fifth, Judge Young is legally incorrect in stating that the local constitutional amendment “allows the Sheriff to determine the nature of bingo.” Regardless of what role might or might not be prescribed for the sheriff in regard to such matters as deciding licensing requirements, see supra note 3, the question of what the constitution means by the term “bingo” is a purely legal question that must be decided by the courts. See Ala. Const.1901, §§ 42 and 43; Marbury v. Madison, 5 U.S. (1 Cranch) at 177 (“It is emphatically the province and duty of the judicial department to' say what the law is.”).
Sixth, Judge Young states that a search warrant is an “extraordinary writ” and that it should not be issued unless the judge issuing it is “soundly convinced of an illegal activity.” Judge Young erred in denying the search warrant on this ground. As discussed below, being “soundly convinced of an illegal activity” simply is not the standard for the issuance of a warrant.
Seventh, Judge Young admonished the State that it could and should pursue a so-called “plain view” seizure if it truly believed there to be probable cause that the machines in the casino were illegal. Here, too, the judge bases his refusal to issue a warrant upon legal error. Even if a warrantless seizure might be constitutionally permissible, that possibility is not a ground for refusing a warrant. In addition, under the Fourth Amendment, the preference is for regulation of searches via the warrant process,[10] and a good-faith reliance on a warrant provides an added measure of protection to the officers against liability for wrongful seizure. (The good-faith exception also may allow the admission of evidence seized even if it is *357 later determined that probable cause did not exist. United States v. Leon, 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).) Further, the State claims that some of the pertinent items to be seized, including contraband cash, computer servers, account books, and records, are not in plain view in the main area of the casino and that a search warrant may facilitate crowd control and avoid loss of evidence and possible danger to patrons at the facility.[11]
Eighth, Judge Young errs as a matter of law in refusing to issue the warrant in this case on the ground that to do so would be “in essence ... declaring these machines to be illegal.” The quoted premise is incorrect. The issuance of a search warrant does not constitute a binding adjudication that an offense has occurred or a binding declaration that an activity or item is illegal. It is only a determination for purposes of the issuance of the search warrant. As explained in Marshall v. Herndon, discussed supra, the issuance of a search warrant is not binding on either the court itself or the parties in an ensuing criminal case in which the defendant wishes to question whether an activity or item is illegal. See also, e.g., United States v. Del Valle, 587 F.2d 699, 701 (5th Cir.1979) (explaining that decision whether to issue search warrant is limited to the question of the issuance of the warrant and does not dispose of the issue whether the defendant did in fact commit the alleged crime).[12]
Contrary to the conclusion reached by Judge Young and the various erroneous legal grounds upon which he based that conclusion, the circumstances presented allow for no reasonable conclusion other than that probable cause exists for the issuance of the search warrant in this case.
“The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the ‘veracity’ and ‘basis of knowledge’ of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.”
Illinois v. Gates, 462 U.S. 213, 238-39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (emphasis added).
“[P]robable cause is a flexible, commonsense standard. It merely requires that the facts available to the officer would ‘warrant a man of reasonable caution in the belief’ that certain items may be contraband ... or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A ‘practical, nontechnical’ probability that incriminating evidence is involved is all that is required.”
Texas v. Brown, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (citations omitted; emphasis added).
*358 The games depicted in the surveillance video and described in the affidavit proffered by Sisson in support of the application for the warrant do not reasonably resemble a game of “bingo.” Without turning a blind eye to that which is depicted in the video and described in the affidavit, a “man of reasonable caution” could reach no conclusion other than that there is a “fair probability” that the machines in question are not the game of bingo and, instead, are slot machines or other gambling devices that are illegal under Alabama law.
The teaching of the United States Supreme Court in Ex parte United States is instructive as to this and any case in which a trial judge exceeds his or her discretion and refuses to issue a search or arrest warrant on legally erroneous grounds:
“The effect of the refusal of the District Court to issue a warrant upon an indictment fair upon its face and properly found and returned is equivalent to a denial of the absolute right of the government, as matters stand, to put the accused on trial, since that cannot be done in his absence. The mere statement discloses the gravity and public importance of the question. It is obvious that, if a like attitude should be taken by District Courts generally, serious interference with the prosecution of persons indicted for criminal offenses might result. Undoubtedly, upon the theory presented by the government, mandamus is the appropriate remedy; and the writ may well issue from this court in order to expedite the settlement of the important question involved, and, incidentally, in furtherance of the general policy of a prompt trial and disposition of criminal cases. Accordingly, we pass to a consideration of the merits.
[[Image here]]
“It reasonably cannot be doubted that, in the court to which the indictment is returned, the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer. Compare McGrain v. Daugherty, 273 U.S. 135, 156-158 [(1927)]; Hale v. Henkel, 201 U.S. 43, 60-62 [(1906) ]. The refusal of the trial court to issue a warrant of arrest under such circumstances is, in reality and effect, a refusal to permit the case to come to a hearing upon either questions of law or of fact, and falls little short of a refusal to permit the enforcement of the law. The authority conferred upon the trial judge to issue a warrant of arrest upon an indictment does not, under the circumstances here disclosed, carry with it the power to decline to do so under the guise of judicial discretion; or, as this court suggested in Ex parte United States, 242 U.S. 27, 42 [(1916) ], the power to enforce does not inherently beget a discretion permanently to refuse to enforce. In United States v. Thompson, 251 U.S. 407 [(1920)], an order of a federal District Court quashing an indictment on the ground that the charge, having been submitted to a previous grand jury, had been resubmitted to a later one without leave of court first obtained, was set aside. This court there said that the power and duty of the grand jury to investigate is original and complete, and may be exercised upon its own motion and upon such knowledge as it may derive from any source which it may deem proper, and is not exhausted or limited by adverse action taken by a previous grand jury, and that a United States district attorney may present, without leave of court, charges which a previous grand jury has ignored. The necessary effect of the *359 District Court’s order, it was said (pp. 412-413), “was to bar the absolute right of the United States to prosecute by subjecting the exercise of that right, not only as to this indictment, but as to all subsequent ones for the same offenses, to a limitation resulting from the exercise of the judicial power,’ and to bar the lawful authority of the United States attorney and of the grand jury ‘by the application of unauthorized judicial discretion.’ These observations are pertinent here.”
287 U.S. at 249-51 (emphasis added).
The Alabama Constitution and the Alabama Legislature decide the criminal law applicable in each of the 67 counties in this State. A circuit judge is not free to frustrate the enforcement of the criminal law by refusing to issue warrants necessary or appropriate to its enforcement in his or her circuit. To allow a judge to do so without the exercise and fulfillment by this Court of its supervisory jurisdiction and responsibility relative to lower courts (see Ala. Const.1901, § 140; § 12-2-7, Ala. Code 1975) would be to allow that judge essentially to rewrite the law in the county he or she serves. This we cannot do.
Based on the foregoing, we agree with the State that Judge Young exceeded his discretion in denying the requested search warrant. The State was entitled to an order directing Judge Young to grant the warrant application and to issue the requested warrant, and this Court issued such an order on February 15, 2013.
Given the inherently ex parte nature of a search warrant, and by necessary extension, of appellate review of the denial of a search warrant, in order that the purpose of the warrant not be frustrated, our order of February 15, 2013, mandated that this mandamus proceeding and the February 15 order itself remain under seal until further order of this Court following the execution of the warrant. We have been formally notified by the State that the warrant has been issued and executed, and this Court on February 19, 2013, issued an order unsealing this proceeding and our February 15 order and stating that an opinion on the matter would follow.[13]
PETITION GRANTED AND WRIT ISSUED BY ORDER DATED FEBRUARY 15, 2013.
STUART, BOLIN, PARKER, MURDOCK, WISE, and BRYAN, JJ., concur.
MOORE, C.J., and MAIN, J., concur in the result.

. We note that Article VI, § 150, Ala. Const. 1901, authorizes the Supreme Court to "make and promulgate rules governing the administration of all courts and rules governing practice and procedure in all courts....” This Court, by the authority vested in it by § 150, has promulgated Rule 3.7, Ala. R.Crim. P., which states:
"Upon request of a law enforcement officer or district attorney, a search warrant authorized by this rule may be issued by:
"(i) A magistrate who is authorized to practice law in the State of Alabama, or who is authorized by law to issue search warrants, within the magistrate’s territorial jurisdiction; or
"(ii) A municipal judge, if the search is to be conducted within the police jurisdiction of the municipality; or
"(iii) A district judge within the county; or
"(iv) A circuit judge within the judge's circuit.”

. Section 13A-12-27, Ala.Code 1975, provides:
"(a) A person commits die crime of possession of a gambling device if with knowledge of the character thereof he manufactures, sells, transports, places or possesses, or conducts or negotiates any transaction affecting or designed to affect ownership, custody or use of:
"(1) A slot machine; or
"(2) Any other gambling device, with the intention that it be used in the advancement of unlawful gambling activity.
"(b) Possession of a gambling device is a Class A misdemeanor.”

. Amendment No. 744, Ala. Const.1901 (now Local Amendments, Macon County, § 1, Ala. Const. 1901 (Off.Recomp.)), states, in part, that "[t]he sheriff shall promulgate rules and regulations for the licensing and operation of bingo games within the county. The sheriff shall insure compliance pursuant to any rule or regulation....”

. Judge Young’s submission to this Court includes the following:
"Next, the Petitioner contends that this Court had expressed no doubt about the credibility of the affiant and his proposed testimony, the accuracy of the video or the sufficiency of the evidence offered to support the application. This court does not routinely criticize the affiants during their proposals for search warrants. It is the position of this Court that it is to observe and take into consideration those matters brought before it and in all other matters made known to the court in order to make a determination as to the sufficiency of probable cause. The Court did so in its decision not to issue the search warrant."

. A judge considering an application for a search warrant necessarily must determine what it is that the law prohibits and then decide whether the evidence before the judge amounts to "probable cause” to believe that the conduct or items at issue fall within that prohibition. In the typical dispute over the propriety of a search warrant, the latter, factual issue predominates. The issue of what it is that extant law prohibits typically is a function solely of the terms of an applicable criminal statute and commonly is not in question. Here, however, the question of exactly what the law prohibits is at the fore and is a function not only of criminal statutes prohibiting "slot machines” and "gambling devices” but also of constitutional provisions permitting "bingo.” (As discussed in the text, infra, in answering this question, Judge Young erroneously relied, among other things, upon the legal conclusion of the Macon County sheriff.)

. In Benners, the relator sought a writ of mandamus in the circuit court to compel a justice of the peace to issue the arrest war *353 rant. This Court affirmed the judgment of the circuit court issuing the writ.

. Rule 3.9, Ala. R.Crim. P., states:
"(a) Evidence. A warrant shall issue on affidavit sworn to before the issuing judge or magistrate authorized by law to issue search warrants, establishing grounds for issuing the warrant, or upon oral testimony pursuant to Rule 3.8(b).''
(Emphasis added.) Grounds for a search warrant exist where "there is probable cause to believe that the property sought ... (4) [cjonstitutes, or is expected to constitute, evidence of a criminal offense under the laws of the State of Alabama or any political subdivision thereof.” Rule 3.8(a), Ala. R.Crim. P.

. The competing considerations the trial court erroneously allowed to interfere with the issuance of the search warrant in Viatical Services were (1) privacy concerns of patients and, of interest for purposes of the present case, (2) concern for the effect of the seizure of files on the ability of the targeted business to keep operating. 741 So.2d at 561.

. In describing the elements of bingo, our opinion in Cornerstone went only so far as necessary to decide the case presented there. Nowhere do we take the position that the elements listed there are exhaustive. See, e.g., Cornerstone, 42 So.3d at 80 ("For purposes of the present case, the Riley defendants do not contend that a ‘bingo game’ must be played only on paper cards, and we, therefore, do not address that issue.”).

. See Illinois v. Gates, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

. We note that in 2010 Judge Young enjoined the State from conducting a plain-view search and seizure of gaming machines at the casino that the State contended were illegal. See Tyson v. Macon County Greyhound Park, Inc., 43 So.3d 587 (Ala.2010) (reversing the injunction).

. That is, both the issue of what it is that extant law prohibits and the issue whether the conduct or items at issue rise to the level of that prohibition are addressed in the ex parte context of an application for a search warrant only for purposes of deciding whether the State is entitled to the warrant; both issues are subject to being revisited at a trial in which the investigated party is present and has notice and an opportunity to be heard.

. As directed in our February 15 order, the attorney general advised this Court that the warrant had been executed by submitting to this Court a copy of the executed search warrant. The copy of the warrant submitted to this Court contains a handwritten notation by Judge Young disclosing the fact of this proceeding and this Court’s February 15 order, despite the fact that that warrant necessarily was to be served on third parties prior to any “further order" of this Court unsealing these matters.