PER CURIAM.
Before us are two appeals (case no. 1101384 and case no. 1110310) and two petitions for writs of mandamus (case no. 1101313 and case no. 1110158) filed by the State of Alabama, all challenging orders entered by a circuit judge in Greene County purporting to require State officials to return to private parties property seized by the State as contraband pursuant to search warrants previously issued by the Greene Circuit Court. Also before us is a petition for a writ of mandamus (case no. 1130598) filed by the State seeking relief from the refusal of a district judge in Greene County to issue warrants similar to the warrants involved in the first four cases based on evidentiary submissions similar to those provided by the State in those same four cases. The latter case appears to involve the same potential defendants and gaming establishments as the *943 first four cases, as well as similar gambling devices alleged by the State to be illegal. Moreover, the district judge in case no. 1130598 relied upon the judgment of the trial judge in the former cases in refusing to issue the warrants in that case. Accordingly, we find it helpful to our discussion of the factual and procedural histories and the legal issues presented to consolidate our discussion of all of these cases in this opinion.
The first four cases referenced above (hereinafter sometimes referred to as “the Rule 3.13 cases”) are cases in which a specially appointed circuit judge for Greene County, Judge Houston L. Brown, initially issued warrants to the State for search and seizure operations at certain gaming establishments in Greene County, including, but not limited to, establishments owned or operated by Greenetrack, Inc. (“Greenetrack”), and Frontier Bingo, Inc. (“Frontier”). Several weeks later, however, in response to motions filed pursuant to Rule 3.13, Ala. R.Crim. P., Judge Brown decided that the warrants had been issued based on an incorrect understanding of applicable criminal law, specifically what was and was not prohibited under certain statutory and constitutional provisions pertaining to “gambling devices,” “slot machines,” and “bingo.” Largely on the basis of his reconsideration of this legal question, Judge Brown ordered the State to return to the gaming establishments all the gaming machines, currency, and other property it had seized pursuant to the warrants.
In case no. 1130598, Greene County District Judge Lillian Jones-Osborne was presented by State officials with applications for search warrants relating to gambling devices similar to those at issue in the Rule 3.13 cases and alleged by the State to be located at facilities owned or operated by Greenetrack and Frontier, and two additional facilities known as River’s Edge Casino and Green Charity Casino. Judge Jones-Osborne refused to grant the State’s applications for these warrants. Specifically, she referred to the order of Judge Brown in the Rule 3.13 cases and adopted Judge Brown’s reasoning as the basis for her decision to deny the State’s applications.

I. Facts and Procedural History

A. The Rule 3.13 Cases

Amendment No. 743, Ala. Const.1901 (now Local Amendments, Greene County, § 1, Ala. Const. 1901 (Off. Recomp.)), provides in part that “[b]ingo games for prizes or money may be operated by a nonprofit organization in Greene County.” It defines “bingo” as “[t]hat specific kind of game commonly known as bingo in which prizes are awarded on the basis of designated numbers or symbols on a card or electronic marking machine conforming to numbers or symbols selected at random.” Charity “bingo,” as permitted by Amendment No. 743, stands as an exception to the general prohibition of gambling in the Alabama Constitution and specific statutes. See Ala. Const.1901, Art. IV, § 65, and Ala.Code 1975, §§ 13A-12-20 and -27, making it a criminal offense to possess “gambling devices,” including but not limited to “slot machines.” See generally Barber v. Jefferson Cnty. Racing Ass’n, Inc., 960 So.2d 599, 603 (Ala.2006).
In April 2011, a team of undercover officers supervised by Lt. Mike Reese of the Alabama Alcoholic Beverage Control ■Board investigated operations at Greene-track’s gaming facility in Greene County. Specifically, the officers examined the gaming machines at the facility to determine whether they were authorized under the charity-bingo exception of Amendment No. 743. The investigation included making a video disc of officers playing the machines that was entered as evidence in *944 the hearing below pertaining to Greene-track’s property. The officers concluded that the machines did not qualify as “bingo” under the definition provided in Amendment No. 743.
In May 2011, a team of undercover officers supervised by Lt. William Carson of the Alabama Alcoholic Beverage Control Board investigated• operations at the Frontier gaming facility in Greene County. As with the Greenetrack investigation, the officers examined gaming machines at the facility, at least some of which were owned by Nova Gaming, LLC (“Nova”), to determine whether they were authorized under the charity-bingo exception of Amendment No. 743. This investigation also included making a video disc of officers playing the machines that was entered as evidence in the hearing below pertaining to Frontier and Nova’s property. As in the Greene-track investigation, the officers concluded that the games played on the machines did not qualify as “bingo” under the definition provided in Amendment No. 743.
Prior to the foregoing events, on July 1, 2010, then Chief Justice Sue Bell Cobb entered an order appointing Jefferson Circuit Judge Houston L. Brown “to preside as circuit judge in all matters concerning” a case styled as State of Alabama v. 825 Electronic Gambling Devices, case no. CV-2010.20, in the circuit court of Greene County. Chief Deputy Attorney General Richard Allen testified in the hearing below pertaining to Greenetrack’s property that because of the July 1, 2010, order he was not sure what judge had authority to rule on a search warrant pertaining to gaming devices in Greene County. Allen telephoned the Administrative Office of Courts to inquire about Judge Brown’s authority in Greene County. On May 17, 2011, then Chief Justice Cobb entered an order appointing Judge Brown as a “special circuit judge” for the 17th Judicial Circuit “until further orders of this Court.”
On May 31; 2011, Lt. Reese and Lt. Carson applied to Judge Brown for warrants to search the Greenetrack and Frontier facilities and to seize gaming machines, records, and proceeds. The affidavits Lt. Reese and Lt. Carson filed in support of their applications for ■ search warrants contained almost identical language and in general concluded that the machines at each facility were
“illegal slot machines under Alabama law, in that they operate by the insertion of a PIN number which activates cash value credits purchased at a cashiers window, and operate with the aid of some physical act by the player, in such a manner that, depending upon elements of chance, they may eject something of value.”
More specifically, the affidavits contrasted what undercover officers observed at the facilities with regard to the machines with the six characteristics of “the game commonly or traditionally known as bingo” provided in Barber v. Cornerstone Community Outreach, Inc., 42 So.3d 65, 86 (Ala.2009). In this regard, Lt. Reese’s affidavit repeated each of those six characteristics and then commented on whether the machines in question satisfied that characteristic:
“(1) ‘Each player uses one or more cards with spaces arranged in five columns and five rows, with an alphanumeric or similar designation assigned to each space.’
“The undercover operations revealed that the predominant display on these machines is a slot machine type display involving a video representation of slot-style spinning reels. There is also a much smaller video depiction of a bingo card on each machine. There is no paper or printed card associated with play *945 of any of the machines. The player is not required to use or interact with a video depiction of a card in any way in the play of the game, and physically cannot personally interact with any video representation of a bingo card once play is initiated. In fact, once cash value credits are inserted using a PIN number, the game can be played blindfolded or with the eyes closed by simply pressing the play button, and can be played without ever looking at or paying any attention to any electronic representation of a bingo card. I observed that players in the facility regularly and typically played the game without looking at any video representation of a bingo card at all.
“(2) ‘Alphanumeric or similar designations are randomly drawn and announced one by one.’
“The undercover operations revealed that in terms of what the human eye can see, the numbers are neither drawn one by one nor are they announced one by one, as required by the Cornerstone opinion. Instead, on one touch machines the first press of the play button on these machines typically caused a video depiction of a large number (approximately thirty) balls to drop simultaneously. An entire game can be played in about three (3) to five (5) seconds on most machines, in one second on others. The three touch machines also [displayed] video depictions of the dropping of a large number of balls at a time. There was no announcer involved in the play of any of the machines.
“(3) ‘In order to play, each player must pay attention to the values announced; if one of the values matches a value on one or more of the player’s cards, the player must physically act by marking his or her card accordingly.’
“The undercover investigation revealed that these machines do not play a game in which ‘a player must pay attention to the values announced.’ In fact, it is not necessary for a player to pay any attention whatsoever to the values announced in order to play the game. Again, once cash credits are inserted by way of a PIN, the game can be played blindfolded or with the eyes closed by simply pressing the play button and can be played without any paper or printed bingo card and without ever looking at any video representation of a bingo card.
“In fact, because the game is played so quickly, it is impossible for the human player to personally match numbers drawn to his or her video representation of a bingo card. In addition, the machines simply require the player to press the play button, after which the machine automatically determines what numbers match at computer speed, which is faster than the human eye can match and daub. The player is not required to recognize any matching numbers or daub them one by one, and in fact cannot daub the numbers one by one.
“(4) ‘A player can fail to pay proper attention or to properly mark his or her card, and thereby miss an opportunity to be declared a winner.’
“The undercover operation revealed that on one touch machines at least, the game once started could not be slept and ended automatically without any player interaction. Furthermore, as to all of the machines, a player is neither required to nor able to recognize and daub matching numbers one by one, and therefore there is no opportunity to improperly mark (i.e., fail to ‘properly mark’) his or her video representation of a bingo card.
“(5) ‘A player must recognize that his or her card has a “bingo,” i.e., a prede *946 termined pattern of matching values, and in turn announce to the other players and the announcer that this is the case before any other player does so.’
“The undercover operation revealed that the player is not required to recognize any numbers drawn on any of the machines, much less any bingo pattern on any physical card (or electronic representation of a card) in order to win. There is no announce, and the players are not required to announce bingo to other players to claim their prizes. Instead, the machine displays to the player whether or not the player has won anything. There is no way for a losing player to identify the player who won, or where that player is located, much less verify that player’s ‘bingo.’
“(6) ‘The game of bingo contemplates a group activity in which multiple players compete against each other to be the first to properly mark a card with the predetermined winning pattern and announce that fact.’
“The undercover operation revealed that there is no meaningful interaction between players on any of the machines. The machines appear to require that at least two machines be activated, but there does not appear to be any requirements that players press buttons simultaneously or complete their games at the same time. Players do not have the opportunity to improperly mark a card. Players are not required to personally identify, recognize, ■ announce, or even know any winning patterns in order to play the game.
“Finally, the machines located at Greenetrack do not simply enable a player to mark his or her card electronically. Instead, the machines totally eliminate the requirements that a player personally recognize and identify matching numbers and take action to mark each matching number on his or her card accordingly as numbers are drawn and announced one by one, and in fact eliminate all elements of human skill and recognition featured in the traditional game of bingo. And rather than electronically marking a card, they eliminate the traditional paper or printed bingo card altogether, and only allow the player who chooses to ignore the larger slot machine display to see a small electronic simulation of a bingo card with which the player cannot interact at all during the computer simulated number draw, and a draw which is simulated at computer speed as described above. Once the player presses the play button on a one touch machine the player can do nothing to influence which individual numbers are or are not marked on any electronic simulation of a bingo card. On a three touch machine, the player can only fail to press the button the second and third time, but cannot influence which specific numbers the machine will automatically daub if the button is pressed the second and third time. Moreover, the machines accept cash value credits and dispense cash value credits by means of a PIN, which has nothing to do with card marking, but which makes the machines slot machines and illegal gambling devices in violation of AIa.Code § 13A-12-20, et seq.”
(Emphasis in original.) After considering the State’s submissions, Judge Brown issued the search warrants.
On June 1, 2011, the State executed the warrants at the Greenetrack and Frontier gaming facilities. The State seized approximately 376 gaming devices at the Greenetrack facility, business records, and $93,917.50 in proceeds. The State seized approximately 267 gaming devices at the Frontier facility, business records, and an unknown amount of proceeds. The prop *947 erty seized at the Frontier facility included gaming machines owned by Nova.
On June 7, 2011, Greenetrack; Frontier, and other entities who are not parties to the cases before us filed a joint “Motion for Return of Seized Property” under Rule 8.13, Ala. R.Crim. P.[1] The motion was referred to Judge Brown.
On June 22, 2011, the State filed in the Greene Circuit Court two civil forfeiture actions as to the gaming machines, records, and proceeds seized through the warrants executed at the Greenetrack and Frontier facilities. The State filed amended complaints on June 24, 2011, and second amended complaints on July 6, 2011. The forfeiture actions were assigned to Judge Eddie Hardaway.
On June 27, 2011, Nova filed a motion for return of property pursuant to Rule 3.13 on the basis of its claimed interest in the property seized under the warrant executed at the Frontier facility. On June 29, 2011, Frontier withdrew its motion for return of property based on the State’s filing its forfeiture action. Nova likewise subsequently withdrew its motion for return of property as a result of the State’s filing of a forfeiture complaint.[2] Greenetrack did not withdraw its motion for return of property.
On July 6-7, 2011, Judge Brown held an evidentiary hearing on Greenetrack’s motion for return of property. Judge Brown heard testimony from Richard Allen and-Judge Hardaway pertaining to the process that led to Judge Brown’s appointment. He also heard from Lt. Reese and Desmond Ladner, a gambling expert presented by the State, regarding their observations of the gaming machines at the Greenetrack facility.
On August 3, 2011, Judge Brown entered an order requiring the State to “RETURN all of the property seized during the execution of the subject search warrant to GREENETRACK, Inc. before the passage of Ten (10) days from the date of this Order.” (Capitalization in original.) Among other things, Judge Brown reconsidered the meaning of the term “bingo” and reached the conclusion that there was not probable cause to believe that the machines at issue were not “bingo games” and therefore illegal gambling devices. • In this regard, Judge Brown reasoned (a) that Lt. Reese has “misled the Court” as to the meaning of the term “bingo,” and (b) that the term “bingo,” as used in this Court’s opinion in Cornerstone and in Amendment No. 743 should be understood as allowing “electronic bingo games” of the type described in the State’s evidence:
“[Lt.] Reese is operating under a mistaken interpretation of the law. At the outset, [Lt.] Reese misled the Court to believe that the games did not comply with the elements of a bingo game identified in Cornerstone. [Lt.] Reese further testified that bingo could only be played using paper cards and that no electronic bingo game could ever be anything other than a slot machine. This is clearly not the case under Amendment 743 or Cornerstone.”
*948 Elsewhere, however, Judge Brown rejected the applicability of the Cornerstone criteria to the cases before him based on the “unique” wording of Amendment No. 743, a local amendment applicable to Greene County. He stated:
“The only pertinent definition of ‘bingo’ in this matter is the definition found in Amendment 743. Amendment 743 defines ‘bingo’ and ‘bingo equipment.’ It is obvious from a plain reading of both definitions that bingo games may be played in an electronic format in Greene County, Alabama. Any other reading would be violative of the Amendment. Furthermore, ... Cornerstone is not binding precedent with regard to Amendment 743.... ”
On August 5, 2011, Nova filed a renewed motion for return of property based on Judge Brown’s order in the Greenetrack proceeding described above; Frontier likewise renewed its motion on August 30, 2011. The State filed motions to dismiss the motions of Nova and Frontier on the ground that the coui’t in the civil forfeiture proceeding had jurisdiction over the subject property. Judge Brown denied the State’s motions to dismiss.
On September 13, 2011, Judge Brown held an evidentiary hearing on Frontier’s and Nova’s motions for return of property in which he heard testimony from an attorney for the State, the Greene County Sheriff, and Lt. Carson.
On October 31, 2011, Judge Brown entered an order that relied upon the findings — and except for changing dates and names tracked the language — of his order in the Greenetrack action. The order required the State to return “all of the property seized during the execution of the subject Search Warrant to Frontier Bingo before the passage of ten (10) days from the date of this Order.”
The State appealed Judge Brown’s order in the Greenetrack action on August 4, 2011 (case no. 1101384). The State also moved in the trial court for a motion to stay the order pending appeal, but the trial court denied the motion. The State then sought from this Court an emergency motion to stay the order. This Court granted a stay of the trial court’s order. It ordered that the State’s emergency motion would be treated as a petition for a writ of mandamus (case no. 1101313), and it consolidated the petition with the State’s appeal of Judge Brown’s order in the Greenetrack action.
The State appealed the trial court’s order in the Frontier and Nova action on November 7, 2011 (case no. 1110310). As in the Greenetrack case, the State moved in the trial court for a stay of its order in the Frontier and Nova action, but the trial court denied the motion. The State sought from this Court an emergency motion to stay the order. This Court granted the stay on November 10, 2011. It ordered that the State’s emergency motion would be treated as a petition for a writ of mandamus (case no. 1110158), and it consolidated the petition with the State’s appeal of the trial court’s order in the Frontier and Nova action.

B. The Denial^of-Warrant Case

In its petition in case no. 1130598, the State takes note of our holding in Cornerstone and our reliance upon Cornerstone last year in Ex parte State, 121 So.3d 337, 359 (Ala.2013). The State also notes that, consistent with these holdings, judges have in recent months issued warrants to the State to seize so-called “electronic bingo machines” in Greene, Houston, Jefferson, and Lowndes Counties and judges in Jefferson and Houston Counties have issued various final rulings finding this sort of gambling illegal. Citing the sworn affidavits of two of its agents, the State posits *949 that, “despite these ... elements, casinos are still openly operating in Greene County” and that, “indeed, gambling appears to be proliferating in Greene County” and that “the casinos’ devices do not even attempt to satisfy the Cornerstone test.” Against this asserted background, the State recounts the following procedural history and facts relating to this case:
“A team of undercover officers conducted operations at four casinos in Greene County over December 2013 and January 2014: Greenetrack Casino (Exh. A), River’s Edge Casino (Exh. B), Greene Charity Casino (Exh. C), and Frontier Bingo (Exh. D). See Exh. E (Aff. of Sisson); Exh. F (Aff. of Butler). They made videos of themselves playing the gambling devices at each casino and assembled detailed affidavits establishing probable cause to seize the machines at each casino and search for related contraband and evidence of illegal gambling. See Exhs. A, B, C, D....
“According to the facts recounted in the affidavits and portrayed on the video, the machines at these Greene County casinos are just as illegal as the machines at issue in Cornerstone. At the very least, the officers have established the same level of probable cause that compelled the Supreme Court to grant the writ in Ex parte State.
“Although there are some differences between the four casinos, their gambling devices are the same in every way that matters. To begin play, the gambler establishes an account with the casino, funds it, and obtains a ‘player’s card’ and/or personal identification number (‘PIN’) that allows him to access the account on the casino’s machines. See Exh. A at 3 (PIN & card); Exh. B at 3 (PIN & card): Exh. C at 3 (PIN & card); Exh. D at 3 (PIN). The gambler then swipes his card and/or enters his PIN into a machine, wagers an amount of money, and begins to play. See id.
“There are three basic kinds of machines being used at these facilities. The display on most of the machines is the kind ‘typically associated with common slot machines’ — reels, lines and bars. Exh. D. at 3. See also Exh. A at 3 (‘either three or five slot machine-type, vertically spinning reels’); Exh. B at 3 (‘machines in the casino looked and operated like electronic slot machines’); Exh. C at 8 (‘With the exception of the Keno game, every machine they played or observed involved the presence of three to five digitally spinning reels with three lines each’). At River’s Edge casino, certain machines also purport to play video poker. Exh. B at 4-5. And, at River’s Edge, Frontier, and Greene Charity casinos, certain machines purported to play keno, which is a lottery-style game. Exh. B at 5-6 (describing keno); Exh. C at 8; Exh. D at 7. Although most of these machines contain a small grid that fills with numbers like a bingo card, the experience of playing these machines is functionally indistinguishable from playing acknowledged slot machines, video poker machines, or keno machines and nothing like the ‘bingo’ game contemplated in Cornerstone. See Exhs. A, B, C, D. The gambler does not pay attention, listen to alphanumeric designations drawn one-by-one, and manually match them up to a bingo card. See Exhs. A, B, C, D. Instead, the gambler presses a button, watches slot-machine reels spin, sees various lines appear on the screen, and is told whether he or she has won — all in a matter of a few seconds. Exh. A at 10 (‘in every case, less than 3 seconds’); Exh. B at 4 (‘2.5 seconds,’ ‘2 seconds’); Exh. C at 4 (‘less than two seconds’); Exh. D at 5 (‘4 seconds’). On other machines, the gambler plays a simulated *950 version of poker or keno. Exh. B at 4-6; Exh. C at 8; Exh. D at 7.
“The officers visited each of the four casinos on either January 14 or January 15. Exh. A at 7; Exh. B at 7; Exh. C at 9; Exh. D at 8.
The only circuit judge in Greene' County, Judge Eddie Hardaway, has been removed from or has recused himself from cases having to do with gambling. See Exh. E [at] 12.
“On January 16, 2014, state officers approached the district judge for Greene County, Judge Lillie Jones-Osborne, and presented her with applications for warrants to search the casinos and seize the illegal machines, computer servers, and other contraband there. See Exh. E ¶ 2-3. The officers presented the judge with four affidavits, one for each casino, each to be sworn before her under the Rules of Criminal Procedure, setting forth the fácts described above, and proposed warrants describing the places to be searched and the items to be seized in detail. See Exh. E ¶ 3-17. The officers also presented the judge with the videos. See Exh. E ¶ 10.
“Judge Jones-Osborne respectfully declined to issue the requested warrants. See Exh. E ¶ 12. The judge reviewed the affidavits but declined to view the videos. Exh. E ¶ 10. The judge did not assert that the State’s evidence was insufficient. See id. at ¶ 12. Judge Jones-Osborne explained instead that she was declining to issue the warrants because of another judge’s decision in 2011 to quash search warrants that he had issued to search and seize gambling devices in Greene County. See Exh. E ¶ 12. The officers had provided those orders to Judge Jones-Osborne for the purposes of full disclosure, and they are attached as attachments 4 and 6 to Exhibit A to this petition.”
According to an affidavit supplied by one of the State’s agents, Judge Jones-Osborne declined to grant the State’s request for the search warrants in this case because she “concluded that she had to rely on what Judge Brown ruled.” In her “answer” to the petition for a writ of mandamus pending before this Court, Judge Jones-Osborne confirms that “she denied the State’s search warrant based on a 17th Judicial Circuit order issued by Judge Houston Brown,” referring to the order of Judge Brown discussed above.
On January 21, 2014, the State filed its petition for a writ of mandamus with the Court of Criminal Appeals seeking an order requiring Judge Jones-Ósborne to issue the warrants requested. Judge Jones-Osborne filed her answer to the petition on February 5, 2014. Pursuant to § 12-3-14, Ala.Code 1975, the case was transferred to this Court on March 7, 2014.

II. Analysis

A. The Rule 3.13 Cases

As a preliminary matter, we are confronted with two related, threshold questions of appellate jurisdiction in relation to the Rule 3.13 cases: (1) whether the proper vehicles for appellate review are the two pending petitions for a writ of mandamus or the two pending appeals, and (2) whether these proceedings are civil or criminal in nature and, in turn, whether they fall within the appellate jurisdiction of this Court or of the Court of Criminal Appeals. At least under the circumstances presented in these cases, we conclude that appellate review is by way of appeal and that these appeals are within the appellate jurisdiction of this Court.
Rule 3.13, Ala. R.Crim. P., was patterned after then Rule 41(e), now Rule 41(g), Fed.R.Crim.P. See Committee Com *951 ment to Rule 3.13, Ala. R.Crim. P.[3] At the time the Rule 3.13 motions were filed, no criminal cases were pending. The United States Supreme Court explained in Di Bella v. United States, 369 U.S. 121, 132, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962), that, where a motion filed under then Rule 41(e) (now Rule 41(g)) is not intended as a motion in limine in a criminal proceeding but, instead, addresses solely the return of the property in question “and is in no way tied to a criminal prosecution in esse [4] against the movant,” the proceeding “can be regarded as independent.” See also, e.g., Mr. Lucky Messenger Serv., Inc. v. United States, 587 F.2d 15, 16 (7th Cir.1978) (quoting Di Bella for the proposition that the denial of a motion for return of property is a final appealable order “ ‘if the motion is solely for return of property and is in no way tied to a criminal prosecution in Esse against the movant’ ”); Caracas Int’l Banking Corp. v. United States, 670 F.Supp.2d 142, 146 (D.P.R.2009) (explaining that “it is possible to pursue relief under Rule 41(g) through an independent action”). Compare Smith v. United States, 377 F.2d 739 (3d Cir.1967) (holding that, for purposes of appealability, an order denying a petition tied to a prosecution against petitioners that was “in esse” was not “final,” where petition sought return of property allegedly obtained in violation of petitioners’ constitutional rights and sought to suppress its use in a criminal prosecution).
Judge Brown entered orders requiring the State to return the subject property in both the Greenetrack matter and the Frontier/Nova matter; of necessity, therefore, he purported to adjudicate all issues in those matters to final determination. Judge Brown’s orders thus amount to final judgments subject to appeal, not interlocutory orders subject to review by a petition for a writ of mandamus. .
Furthermore, at least where, as here, there is no criminal case pending, it is clear that the action generated by the filing of a motion under Rule 3.13 and the trial court’s order adjudicating that motion are properly considered civil in nature and, accordingly, that jurisdiction over the appeal of the trial court’s order would lie in this Court rather than in the Court of Criminal Appeals. In this regard, we note the case of State v. Cobb, 660 So.2d 1014 (Ala.Civ.App.1995), in which the plaintiff filed a Rule 3.13 motion when “[tjhere was no pending criminal action, and the motion was docketed in the trial court as a civil action.” 660 So.2d at 1014. The Court of Civil Appeals did not question its jurisdiction over the appeal. More recently, in Jones v. State, 937 So.2d 59 (Ala.2006), this Court held that a “motion” seeking an order to require the State to return cur *952 rency and firearms following both a successful forfeiture action against those items and a conviction on related criminal charges gave rise to a civil action from which an appeal would lie to the Court of Civil Appeals. See generally § 12-3-10, Ala.Code 1975 (assigning to the Court of Civil Appeals appellate jurisdiction over civil matters where the amount in controversy does not exceed $50,000).
Federal authorities on this issue are, if anything, even more clear that a motion for return of property filed under the parallel federal Rule 41(g), at least when no criminal action is pending, gives rise to an independent action that is civil in nature. See United States v. Comprehensive Drug Testing, Inc., 621 F.3d 1162, 1172 (9th Cir.2010) (en banc) (“[W]hen the motion [to return property] is made by a party against whom no criminal charges have been brought, such a motion is in fact a petition that the district court invoke its civil equitable jurisdiction.”); United States v. Howell, 425 F.3d 971, 974 (11th Cir.2005) (“A motion to return seized property under Fed.R.Crim.P. 41(g), is a motion in equity, in which courts will determine all the equitable considerations in order to make a fair and just decision.”); United States v. Search of Music City Mktg., Inc., 212 F.3d 920, 923 (6th Cir. 2000) (“There is no criminal indictment or proceeding pending against Music City. Thus, Music City’s Rule 41 [ (g) ] motion for the return of its property was really in the nature of a civil proceeding invoking the court’s equitable powers, rather than a criminal proceeding.”); Pena v. United States, 122 F.3d 3, 5 (5th Cir.1997) (“[R]ule 41 [ (g) ] proceedings ... have always been considered to be civil actions.”); Mora v. United States, 955 F.2d 156, 158 (2d Cir.1992) (“[W]here no criminal proceedings against the movant are pending or have transpired, a motion for the return of property is ‘treated as [a] civil equitable proceeding[] even if styled as being pursuant to Fed.R.Crim.P. 41[ (g) ].’ ” (quoting United States v. Martinson, 809 F.2d 1364, 1367 (9th Cir. 1987))); United States v. Martinson, 809 F.2d at 1366-67 (“A district court has jurisdiction to entertain motions to return property seized by the government when there are no criminal proceedings pending against the movant.... Such motions are treated as civil equitable proceedings even if styled as being pursuant to Fed. R.Crim.P. 41[ (g) ].”); and Mr. Lucky Messenger Sen., Inc., 587 F.2d at 16 (“The motion for return of property is not one tied to a criminal prosecution in esse against the movant until the criminal process shifts from the investigatory phase to the accusatory.”).
In addition, it should be kept in mind that the Rule 3.13 cases concern property seized as contraband that is the subject of pending forfeiture actions. The Rule 3.13 court, in an adversarial proceeding between the “defendants” and the State, effectively has decided the very legal and factual issues that are presented for adjudication in those forfeiture actions. Specifically, the Rule 3.13 judge necessarily has decided the purely legal question of what standard must be met in order for the property at issue to considered illegal and, in turn, necessarily has measured the evidence and facts of the case against that standard to determine that the property may be “lawfully possessed” (as it must be in order to qualify for relief under Rule 3.13). Such determinations have effectively adjudicated the civil forfeiture actions. Further still, the execution of Judge Brown’s orders for the return of the property to those from whom it was seized would implicate the jurisdiction of the trial court in the in rem, civil forfeiture action.
Based on all the foregoing, we are clear to the conclusion that the actions before us *953 are civil in nature. Because, unlike the controversy in Jones v. State, supra, they each involve an amount in controversy in excess of $50,000, these appeals fall within the appellate jurisdiction of this Court. Compare § 12-2-7, Ala.Code 1975 (providing that the Supreme Court is “[t]o exercise appellate jurisdiction coextensive with the state, under such restrictions and regulations as are prescribed by law5’) with § 12-3-10 (providing that the Court of Civil Appeals has appellate jurisdiction over “all civil cases where the amount involved, exclusive of interest and costs, does not exceed $50,000”).
Having determined that the appeals filed by the State are the appropriate mechanism for appellate review and that those appeals are within the appellate jurisdiction of this Court, we now turn our attention to the merit of those appeals. For the reasons set forth below, we conclude that the trial court lacked subject-matter jurisdiction to enter the judgments from which the appeals are taken.
As noted, Rule 3.13 begins as follows:
“A person aggrieved by an unlawful search and seizure may move the court for the return of the property seized on the ground that he or she is entitled to lawful possession of the property which was illegally seized.”
(Emphasis added.) As the federal courts have explained in applying the analogous federal rule, to succeed in obtaining a return of property under the rule, the mov-ant must prove not only that the seizure of the property was illegal but also that the movant is entitled to “lawful possession” of the property. See, e.g., Shea v. Gabriel, 520 F.2d 879, 882 (1st Cir.1975) (“[A]ppellant made no effort to show that he is entitled to lawful possession of the seized items. Rule 41[ (g) ] ‘provides for a return of the property if (1) the person is entitled to lawful possession and (2) the seizure was illegal.’ Advisory Comm. Note, 56 F.R.D. 143, 170 (1972). No showing was made or offered that the things seized were appellant’s lawful property rather than components of an illegal gambling business.” (emphasis added)); Matter of Ninety-One Thousand Dollars in United States Currency, 715 F.Supp. 423, 427 (D.R.I.1989) (“The gravaman of the motion, however, is petitioner’s dual assertion that the search and seizure procedures employed by law enforcement officials in a particular situation violated petitioner’s Fourth and Fourteenth Amendment rights and deprived the complainant of property to which she was lawfully entitled.” (emphasis added)). Thus, if property is held only for its evi-dentiary value and is not, itself, seized as an illegal thing, Rule 41(g) provides for its return in the event of a determination that its method of seizure was illegal and that ownership of the property is in the claimant rather than some other party. See United States v. Wilson, 540 F.2d 1100, 1103-04 (D.C.Cir.1976); United States v. Palmer, 565 F.2d 1063, 1064 (9th Cir.1977).
On the other hand, contraband “is illegal to possess and therefore not susceptible of ownership.” Farmer v. Florence Cnty. Sheriff's Office, 401 S.C. 606, 613, 738 S.E.2d 473, 477 (2013) (citing Mims Amusement Co. v. SLED, 366 S.C. 141, 621 S.E.2d 344 (2005)). “[A]lthough [Rule 41(g) ] is ostensibly broad enough to reach any unlawful seizure, a movant has no right to the return of property that is contraband.” Matter of Ninety-One Thousand Dollars in United States Currency, 715 F.Supp. at 427. Indeed, as the Comment to Rule 41(g) itself notes, that rule is of no moment “in cases involving contraband which, even if seized illegally, is not to be returned.” Comments to 1972 *954 Amendments, Rule 41, Fed.R.Crim.P. The Committee Comments to Alabama’s Rule 8.13 similarly explain:
■ “Of course, if the property seized is contraband, it can be lawfully held even if the property is subject to the exclusionary rules and does not have to be returned.”
In light of the foregoing, federal courts have consistently held that, where a forfeiture action has been commenced, it is inappropriate for the trial court to take up the Rule 41(g) motion. The issues raised by such a motion — the legality of the search and, in particular, the legality of the seized items — must be examined and decided in the forfeiture proceeding, and the Rule 41(g) proceeding was intended to yield to it. “When property is retained pursuant to civil forfeiture, instead of for use as evidence, a Rule 41[ (g) ] motion is not available.” United States v. Watkins, 120 F.3d 254, 255 (11th Cir.1997) (emphasis added). See also United States v. Castro, 883 F.2d 1018, 1020 (11th Cir.1989) (holding that federal Rule 41(g) could not be invoked because “Defendant’s cars and boat are not being retained to be used as evidence against him”; rather, “these vehicles are being detained strictly pursuant to civil forfeiture provisions”).
“Although it is possible to pursue relief under Rule 41(g) through an independent action, such an action is generally precluded by the existence of parallel civil forfeiture proceedings. See, e.g., Rosevita Charter Constr. Corp. v. United States, 787 F.Supp. 39, 43-44 (D.P.R. 1992). Several courts have held that a pending civil forfeiture action, rather than an independent Rule 41(g) motion, is the proper forum to address issues related to government seizure of property. See Rosevita Charter Constr. Corp., 787 F.Supp. at 43; De Almeida v. United States, 459 F.3d 377, 382 (2d Cir. 2006); [United States v.] Hernandez, 911 F.2d [981] at 983 [ (5th Cir.1990) ]; United States v. Price, 914 F.2d 1507, 1511 (D.C.Cir.1990); Shaw v. United States, 891 F.2d 602, 603 (6th Cir.1989); United States v. Castro, 883 F.2d 1018, 1019 (11th Cir.1989); United States v. U.S. Currency $83,310.78, 851 F.2d 1231, 1235 (9th Cir.1988).”
Caracas Int’l Banking Corp. v. United States, 670 F.Supp.2d 142, 146 (D.P.R. 2009) (emphasis added).
“We have not previously reviewed the dismissal of a Rule 41(g) motion in favor of a pending criminal forfeiture proceeding; but we have upheld dismissal where the government had commenced a civil forfeiture proceeding. In In Re One 1987 Jeep Wrangler Automobile,- we observed that where ‘the claimant is afforded the opportunity to test the legality of the seizure in the forfeiture proceeding,’ relegating the claimant to that proceeding would avoid problems inherent in parallel proceedings. 972 F.2d 472, 479 (2d. Cir.1992). Other Circuits have similarly held that a pending administrative or civil forfeiture proceeding affords an adequate remedy at law and thereby justifies dismissal of the Rule 41(g) motion. See United States v. Price, 914 F.2d 1507, 1511 (D.C.Cir. 1990) (per curiam) (‘Accordingly, we now hold that once the Government initiates an administrative forfeiture proceeding and the property is not the subject of an ongoing criminal proceeding, the District Court has no jurisdiction to resolve the issue of return of property.’); Shaw v. United States, 891 F.2d 602, 603-04 (6th Cir.1989) (explaining that Rule 41[ (g) ] is an equitable remedy, and ‘[u]nder standard equity doctrine, where there is an adequate remedy at law it must be pursued’); United States v. Castro, 883 F.2d 1018, 1019 (11th Cir.1989) (per curiam) (‘It is well-set- *955 tied that the proper method for recovery of property which has been subject to civil forfeiture is not the filing of a Rule 41[ (g) ] Motion, but filing a claim in the civil forfeiture action.’); United States v. United States Currency $83,810.78, 851 F.2d 1231, 1233-85 (9th Cir.1988); In re Harper, 835 F.2d 1273, 1274-75 (8th Cir. 1988) (district court did not abuse discretion in not exercising equitable jurisdiction under Rule 41 [ (g) ] after government instituted forfeiture proceeding).”
De Almeida v. United States, 459 F.3d 377, 382 (2d Cir.2006) (emphasis added). See also, e.g., United States v. Real Prop. Commonly Known as 16899 R.W. Greenbrier, Lake Oswego, Clackamas Cnty., 774 F.Supp. 1267, 1274-75 (D.Or.1991) (to like effect).
As indicated, some federal decisions suggest that an order granting relief under Rule 41(g) must yield to a separate forfeiture action because, in relation to the forfeiture action, the Rule 41(g) action lacks equity based on the adequacy of other relief made available by the pendency of the forfeiture action; others indicate that the obstacle to consideration of a separate Rule 41(g) motion when a forfeiture action is pending is jurisdictional in nature. As to the latter, see also United States (DEA) v. One 1987 Jeep Wrangler Auto. VIN No. 2BCCL8132HBS12835, 972 F.2d 472, 479 (2d Cir.1992), commenting on an administrative forfeiture process through which a claimant can trigger a judicial forfeiture proceeding and stating:
“Under all of the above scenarios, the claimant is afforded the opportunity to test the legality of the seizure in the forfeiture proceeding. See In re Harper, 835 F.2d 1273, 1274 (8th Cir.1988). Consequently, once the administrative process has begun, the district court loses subject matter jurisdiction to adjudicate the matter in a peripheral setting such as a Rule 41[ (g) ] motion. United States v. Price, 914 F.2d 1507 (D.C.Cir. 1990).... To hold otherwise would be to ignore the jurisprudential particularities of actions in rem (as discussed above) and to thwart the DEA’s grant of limited administrative autonomy. See 21 C.F.R. §§ 1316.77, 1316.78. Here, the administrative forum afforded the claimant the opportunity to raise all objections to the seizure and the lack of a judicial remedy deprived him of nothing. Thus, we find that the district court properly dismissed the action before it for lack of jurisdiction and therefore we affirm its holding.”
(Emphasis added.) See also, e.g., Application of Mayo, 810 F.Supp. 121, 122 (D.Vt. 1992) (noting that, “[ujnder Second Circuit precedent, upon proper commencement of the administrative process, a district court ‘loses subject matter jurisdiction to adjudicate the matter in a peripheral setting such as a Rule 41[ (g) ] motion’ ”).
The foregoing cases aid in framing the issue presented here. The case before us is not one in which a movant seeks the return of mere “evidence” retained by the State for use in support of the State’s case. Instead, the subject property is held by the State on the ground that it is contraband and is subject to forfeiture as such. On this basis alone, we would be sympathetic to the view expressed in those federal cases discussed above that consider the issue in jurisdictional terms, especially when one considers that an adverse result for the State in a Rule 3.13 proceeding would deprive a forfeiture court of possession of the alleged contraband necessary for its jurisdiction.
Although the discussion of the foregoing federal cases is therefore instructive, our holding today ultimately is grounded in our precedents. More specifically, our holding is informed by the principle that *956 an “accused” may not employ independent judicial proceedings to preempt or thwart the executive branch’s exercise of the discretion afforded it to pursue criminal prosecutions or forfeiture actions for the purpose of enforcing our criminal laws.
We explained in Tyson v. Macon County Greyhound Park, Inc., 43 So.3d 587, 589-90 (Ala.2010), that the collateral civil action attempted in that case was not permissible because it would “interfere with the orderly functioning of the executive branch within its zone of discretion in violation of the separation-of-powers doctrine set forth at § 43 of the Alabama Constitution of 1901.” See also Citizenship Trust v. Keddie-Hill 68 So.3d 99, 106 (Ala.2011) (to like effect and discussing Macon County Greyhound Park). Similarly, in Ex parte Rich, 80 So.3d 219, 225 (Ala.2011), we held that the Montgomery Circuit Court lacked subject-matter jurisdiction over a collateral proceeding that would interfere with “law enforcement’s effort to enforce the criminal laws of the State of Alabama” through the filing of a forfeiture action pursuant to § 13A-12-30, Ala.Code 1975.[5] See also Redtop Mkt., Inc. v. State ex rel. Green, 66 So.3d 204, 205-06 (Ala.2010).
Like the above-cited cases, these are not cases in which the property seized was seized merely as evidence of a crime (i.e., that otherwise is subject to being lawfully owned) and in which the gravamen of the motion is merely some faulty procedure followed by the State in seizing it. We may presume for present purposes that Rule 3.13 would have ample field for operation in such circumstances.[6]
Instead, these are cases in which the State takes the position that the property seized is itself the illegal thing. In response, the accused has initiated an independent proceeding that, if allowed to proceed, would require the State, in advance of any criminal prosecution or civil forfeiture proceeding, to prove the same “case” it would prove in such proceedings. In this key respect, these cases are like the aforementioned seminal case of Macon County Greyhound Park, in which “[t]he gravamen of [VictoryLand’s separate] complaint [was] VictoryLand’s assertion that its activities are lawful and that it will suffer irreparable injury if the machines are seized.” 43 So.3d at 589. It is on this same gravamen—the assertion that the property seized or to be seized is legal — that the movants seek relief in these present cases.
Indeed, the Rule 3.13 movants seek to rest upon the gravamen of the alleged lawfulness of the seized property as the basis for not just one, but both, of the elements necessary for relief under Rule 3.13. First, because of their interpretation of Amendment No. 743, the movants take the position that the machines at issue are games of “bingo” and that the property seized therefore meets the lawfully-possessed element of Rule 3.13. Moreover, it *957 is on the basis of this same assertion as to the meaning of the term “bingo” that the movants contend that the search warrants were issued without probable cause that the targeted property was illegal and that, therefore, the unlawful-seizure element of Rule 3.13 also was satisfied. To decide these motions on their merits as postured, therefore, would require the trial court to put the State to trial on the very issues the State seeks to prosecute by its seizure of the property and an ensuing criminal prosecution or civil forfeiture action. The trial court no more has the subject-matter jurisdiction to do this in the present cases than did the trial court in Macon County Greyhound Park.
Macon County Greyhound Park and its progeny are grounded in the separation-of-powers doctrine found in § 43 of the Alabama Constitution of 1901 and, specifically, the restriction this doctrine places on the ability of the judicial branch to invade the discretion and power vested in our executive branch with respect to the enforcement of Alabama’s criminal laws. See Piggly Wiggly No. 208, Inc. v. Dutton, 601 So.2d 907, 910-11 (Ala.1992); Fitts v. McGhee, 172 U.S. 516, 531-32, 19 S.Ct. 269, 43 L.Ed. 535 (1899).[7] Macon County Greyhound Park and its progeny stand for the proposition that a party may not litigate in advance or by separate proceeding the question of the lawfulness of an activity or property subject to prosecution by law-enforcement authorities. “[Ijnstead,” as we said in Macon County Greyhound Park, “the party aggrieved by such enforcement shall make his case in the prosecution of the criminal action.” 43 So.3d at 589. Of course, the same is true if and when law-enforcement officials choose the alternative enforcement mechanism of a forfeiture action, as in Ex parte Rich, supra. In either case, the gravamen of the enforcement mechanism pursued by the executive branch is the illegality of the activity or item itself, and the accused is not free to preempt or to thwart that prosecution by asking the judicial branch to decide the same question in some separate proceeding. As we explained in Macon County Greyhound Park, such actions will not be entertained where their “ ‘only effect would be to decide matters which properly should be decided in a criminal action.’” 43 So.3d at 589 (quoting 22A Am.Jur.2d Declaratory Judgments § 57 (2003)).
We further made clear in Macon County Greyhound Park that the principle recognized in that case “ ‘applies ... to prosecutions which are merely threatened or anticipated as well as to those which have already been commenced. The rule extends to ... searches and seizures in the course of investigation of crime....’” 43 So.3d at 589 (quoting 43A C.J.S. Injunctions § 280 (2004)). Of particular relevance for both that case and the present case, Macon County Greyhound Park also stands for the proposition that it is not a ground for relief in a separate proceeding
“ ‘that the prosecuting officer has erroneously construed the statute on which the prosecution is based so as to include the act or acts which it is the purpose of the prosecution to punish....
“ ‘... [Tjhe fact that the enforcement thereof would materially injure the complainant’s business or property constitutes no ground for equitable interference, and is not sufficient reason for *958 asking a court of equity to ascertain in advance whether the business as' conducted is in violation of a penal statute....’”
43 So.3d at 589 (quoting 43A C.J.S. Injunctions § 280 (footnote omitted)).
In Tyson v. Jones, 60 So.3d 831 (Ala. 2010), this Court distinguished the circumstances presented there from those presented in Macon County Greyhound Park and its progeny by noting that “[n]o attempt is made ..., as it was in Macon County Greyhound Park, to determine the legality of certain conduct or devices by means of some action other than a criminal prosecution or a forfeiture under Ala.Code 1975, § 13A-12-30.” 60 So.3d at 842 n. 5. The same cannot be said here.
The judgments entered by Judge Brown in the Rule 3.13 proceedings, if allowed to stand, will foreclose the ability of the State to prosecute either a criminal action or a civil forfeiture action. They will effectively adjudicate the very legal issue that would be the gravaman of such actions. Further, they will deprive the State of the very property it seeks to condemn in an in rem forfeiture action, returning to private hands property the State contends constitutes illegal gambling devices while simultaneously thwarting the efforts of executive-branch officials to adjudicate the question of that illegality in a civil forfeiture proceeding. Judge Brown was without jurisdiction to enter such judgments in response to the Rule 3.13 motions.

B. The Denial-of-Warrant Case

Before turning to the merits of Judge Jones-Osborne’s refusal to issue a search warrant in case no. 1130598 and her adoption of Judge Brown’s legal rationale in the Rule 3.13 proceedings as the basis for this refusal, we find it instructive to compare other aspects of the procedural posture of and issues raised in the State’s request for that warrant with the procedural posture of and issues raised in the Rule 3.13 proceedings. Such a comparison is helpful because it is corroborative of the foregoing discussion of the lack of jurisdiction of our courts to adjudicate in the Rule 3.13 proceedings the issues raised there while simultaneously being explanatory of why we do have jurisdiction to assess, and possibly deny, the State’s request for a search warrant.
As in the case of a Rule 3.13 motion, in considering an application for a search warrant, the trial judge must decide the proper legal standard against which to measure the evidence presented. Ex parte State, 121 So.3d 337, 355 (Ala. 2013). It does so, however, only for the purpose of deciding whether to issue the requested search warrant. Id. Likewise, it must evaluate the evidence, but, again, it does so only for the purpose of deciding whether it is “probable” that the facts will eventually be proven to meet that legal standard. Id. In other words, decisions as to the issuance of a warrant are not made in a context like independent Rule 3.13 adjudications where a judgment by the trial court that property is lawful and must be returned by the State to the opposing party gives rise to a final judgment that is binding on both parties. Moreover, search-warrant determinations are as a rule made in circumstances where they are mandated by competing constitutional concerns, see U.S. Const. Amend. 4, that constitute a circumscription of the powers otherwise vested in the executive branch to fulfill its law-enforcement function.
That said, a decision to deny an application for a warrant cannot properly be made based on an incorrect legal standard. Id. That is what happened in this case.
As noted, in the Rule 3.13 proceedings, Judge Brown was critical of the *959 State agent who supplied the affidavit supporting the application for the search warrant for “misleading” him as to the proper legal standard to be applied. In regard to a request for a search warrant, however, the role of a witness is to give evidence regarding the facts; the role of the judge is to decide the law against which that evidence will be measured. If a mistaken understanding of law is used as a framework to assess the facts presented by a witness, the mistake is the court’s, not the witness’s. To the degree Judge Brown— and by extension Judge Jones-Osborne— ruled against the State based on a witness’s understanding of what our law does and does not prohibit, such a ruling was based on an erroneous understanding of the judge’s role in the warrant process. See id.
Despite his criticism of a State agent for allegedly misleading him as to what the law was, it appears that Judge Brown ultimately did in fact make his own determination of that law, a determination upon which Judge Jones-Osborne in turn relied. She then concluded that the facts did not rise to the level necessary to meet that legal standard (or, more precisely, that the evidence did ■ not establish a probability that the facts eventually to be proven would meet that standard). It is in the first of these two determinations that there was an error of law that must be corrected in case no. 1130598.
Amendment No. 743, just like the amendment at issue in Cornerstone and bingo amendments applicable to other counties, speaks of and permits the playing of “bingo games” (provided that a number of other restrictions, including charitable purposes, are met). We identified in Cornerstone and we reaffirm today that the game of “bingo” as that term is used in local constitutional amendments throughout the State is that game “commonly or traditionally known as bingo,” 42 So.3d at 86, and that this game is characterized by at least the six elements we identified in Cornerstone. Id.
There is, however, at least one notable difference between Amendment No. 743 and the comparable amendments in most other counties — namely the fact that the “card” required for the playing of bingo may be “an electronic marking machine.” It is on this difference that Judge Brown and Judge Jones-Osborne based their decisions as to the proper legal standard by which to measure the evidence presented by the State. We therefore must further examine this difference.
In Cornerstone, we explained that, among other things, the game commonly or traditionally known as bingo involved “each player”[8] utilizing a “card” with a certain pattern and universe of alphanumeric or other designations and that each player must respond to the random drawings of these designations by an “announcer” by manually marking this card. 42 So.3d at 86. Clearly, the “bingo” at issue in this case does not employ a “card” in the sense of a flat rectangular or square object made of paper, cardboard, or some similar material on which the required designations are printed. Obviously aware that no such “card” was used in the games in the present case, Judge Brown considered the provisions for “electronic marking machines” in Amendment No. 743 to allow bingo to be played in Greene County without the necessity of such a card. In this he was correct.
The question, however, is whether the ability to employ an “electronic marking *960 machine” obviates all the other criteria of bingo this Court has recognized. Clearly, it does not. By way of explanation, we reiterate and affirm our discussion of Amendment No. 743 in Cornerstone itself:
“In contrast to the use of merely the term ‘bingo games,’ ... Amendment No. 748 ... legalizes in Greene County a form of bingo that would include an ‘electronic marking machine’ in lieu of a paper card. Even [Amendment No. 743], which is the only amendment in Alabama we have located that makes any reference to the use of electronic equipment of any form, contemplates a game in all material respects similar to the game of bingo described in § 45-8-150(1), [Ala.Code 1975,] and something that is materially different from the types of electronic gaming machines at issue here. Amendment No. 743 begins by saying that ‘bingo’ is ‘[t]hat specific kind of game commonly known as bingo.’ The definition then explains that bingo is a game ‘in which prizes are awarded on the basis of designated numbers or symbols on a card or electronic marking machine conforming to numbers or symbols selected at random.’ Moreover, the equipment contemplated by Amendment No. 743 for use in a bingo game is entirely different than the equipment at issue here. Specifically, Amendment No.. 743 defines ‘equipment’ for the game of bingo as follows:
“ ‘The receptacle and numbered objects drawn from it, the master board upon which such objects are placed as drawn, the cards or sheets bearing numbers or other designations to be covered and the objects used to cover them or electronic card marking machines, and the board or signs, however operated, used to announce or display the .numbers or designations as they are drawn.’ ”
Cornerstone, 42 So.3d at 79-80. Clearly, the fact that an “electronic marking machine” can be substituted for a paper card under the terms of Amendment No. 743 does not eliminate the requirement that, in all other respects, the game of bingo permitted by that amendment be the game traditionally known as “bingo.” Judge Jones-Osborne therefore erred in rejecting this traditional definition and in refusing to issue the requested search warrants as a result.[9]
As we explained in Ex. parte State:
“Cases both within and without Alabama make clear that a court considering the issuance of a warrant acts outside its discretion when it denies the warrant based on an improper or erroneous legal ground. This Court long ago held that a writ of mandamus may be used to require the issuance of a warrant under such circumstances.
*961 “In Benners v. State ex rel. Heflin, 124 Ala. 97, 26 So. 942 (1899), this Court held that mandamus will lie to compel the issuance of an arrest warrant where the magistrate refused to issue the warrant based only upon the supposed invalidity of a statute. Benners is thus similar to the present case in that both involve a legal question as to what conduct is prohibited under extant law. The Court in Benners explained the availability of mandamus as follows:
“ ‘Mandamus as a remedy is available in criminal as well as in civil cases. While it will not ordinarily in either case be used to direct a judicial officer how to act in the performance of discretionary judicial functions, it will lie to set in motion the performance of official duties, whether they be judicial or ministerial. So it lies to compel an inferior court to proceed with a criminal trial or proceeding of which the court has wrongfully declined jurisdiction and to compel an officer charged with the duty to take cognizance of a criminal charge preferred by affidavit, and thereon to issue his warrant of arrest.... The affidavit is regular in form, and full in substance. When made, it became the duty of the justice to issue his warrant of arrest, returnable as provided by the act of February 9, 1895 (Acts 1894-95, p. 498).
“ ‘There was no error in the judgment awarding the writ of mandamus, and it will be affirmed.’
“124 Ala. at 101-02, 26 So. at 943-44
“In Marshall v. Herndon, 161 Ky. 232, 170 S.W. 623 (1914), the Kentucky Supreme Court likewise considered a trial court’s refusal to issue a warrant based on an improper legal ground.
Similar to the error in Benners, the error in Marshall concerned whether the challenged conduct was prohibited by a viable criminal statute. As in the present case, there was no dispute as to the facts; the only question was the purely legal one — whether there was in place a statute that made the suspect’s conduct a crime. The Kentucky Supreme Court’s analysis, which begins by noting a Kentucky statute similar to Rule 3.8 and Rule 3.9, Ala. R.Crim. P., is helpful:
“‘Section 31, Criminal Code, is as follows:
“ ‘ “A magistrate shall issue a warrant for the arrest of a person charged with the commission of a public offense, when, from his personal knowledge, or from information given to him on oath, he shall be satisfied that there are reasonable grounds for believing the charge.”
“ ‘This section makes it the imperative duty of the magistrate to issue a warrant whenever he shall be satisfied, from the information given him on oath, that there are reasonable grounds for believing the charge. The question before the magistrate at this time is not whether accused is guilty or should be convicted. Such matters as guilt and conviction are presented to him for judicial determination, when the accused is arrested and brought before him for trial....
“‘Since the pleadings show that there was a valid city ordinance on the subject, and it is admitted that the affidavit was sufficient, we think it was the duty of the magistrate to issue the warrant, and, upon refusal to act, he can be compelled to do so by mandamus, and on this state of facts *962 the lower court erred in dismissing the petition.’
“161 Ky. at 234,170 S.W. at 624....
“Likewise, in State v. Viatical Services, Inc., 741 So.2d 560 (Fla.Dist.Ct App.1999), there was no dispute as to the applicable facts. The Florida District Court of Appeal held that the trial court had committed legal error in declining to issue the search warrant by improperly allowing other considerations to override the existence of probable cause. Treating a petition for a writ of mandamus as a petition for the writ of certiorari, the Florida appellate court ordered a trial court to issue a search warrant that had been denied:
“ ‘... [Iff the state shows a departure from the essential requirements of law, a writ should issue. What the trial court has done in effect is to suppress evidence prior to its seizure by a pre-seizure hearing. We frequently review suppression orders where the court has suppressed evidence in a post-seizure hearing. Review of such pretrial order is appeal-able. See Fla. R.App. P. 9.140(c)(1)(B). Because the state has no similar remedy from this pre-sei-zure hearing, we review it by certiora-ri.’
“741 So.2d at 562....
“Finally, we find noteworthy the observations by one commentator based on his review of the cases:
“ ‘... [Reviewing courts have ordered warrants to issue when a magistrate refused to do so on a ground that was extrinsic to probable cause, such as his belief that his term of office had expired, or that the statute allegedly violated was unconstitutional.’
“Abraham S. Goldstein, The Search Warrant, the Magistrate, and Judicial Review, 62 N.Y.U.L.Rev. 1173, 1196 (1987) (emphasis added). Cf. State ex rel. Umbreit v. Helms, 136 Wis. 432, 118 N.W. 158 (1908) (under its general supervisory powers, state supreme court had the power to compel a trial court to proceed with the trial in a criminal case after the lower court quashed a good complaint upon the purely legal ground that the acts complained of did not constitute an offense).”
Ex parte State, 121 So.3d at 352-55 (some original emphasis omitted; some emphasis added; footnotes omitted).
We have reviewed the affidavits and the video evidence submitted by the State, and the circumstances presented allow for no reasonable conclusion other than that probable cause exists for the issuance of the search warrants requested. As we stated in Ex parte State:
“The games depicted in the surveillance video and described in the affidavit ... in support of the application for the warrant do not reasonably resemble a game of ‘bingo.’ Without turning a blind eye to that which is depicted in the video and described in the affidavit, a ‘man of reasonable caution’ could reach no conclusion other than that there is a ‘fair probability’ that the machines in question are not the game of bingo and, instead, are slot machines or other gambling devices that are illegal under Alabama law.
“The Alabama Constitution and the Alabama Legislature decide the criminal law applicable in each of the -67 counties in this State. A circuit judge is not free to frustrate the enforcement of the criminal law by refusing to issue warrants necessary or appropriate to its enforcement in his or her circuit. To allow a judge to do so without the exer *963 cise and fulfillment by this Court of its supervisory jurisdiction and responsibility relative to lower courts (see Ala. Const. 1901, § 140; § 12-2-7, Ala.Code 1975) would be to allow that judge essentially to reunite the law in the county he or she serves. This we cannot do.”
121 So.3d at 358-59 (emphasis added).
Based on the foregoing, we agree with the State that Judge Jones-Osborne exceeded her discretion in denying the requested search warrants. The State was entitled to an order directing the judge to grant the warrant application and to issue the requested warrant, and this Court issued such an order on March 25, 2014.

III. Conclusion

In effect, Judge Brown was asked to adjudicate preemptively, within the con-fínes of a motion filed under Rule 3.13, Ala. R.Crim. P., the lawfulness of property seized as contraband. He had no jurisdiction to do so. We therefore vacate the orders of the trial court in both the Green-etrack appeal (case no. 1101384) and the Frontier/Nova appeal (case no. 1110310) and dismiss those actions. We dismiss the appeals in those cases, and we dismiss the related petitions for writ of mandamus pending before us in case no. 1101313 and case no. 1110158.
As to case no. 1130598, we have by separate order granted the State’s petition for a writ of mandamus and have remanded this case to Judge Jones-Osborne for the immediate issuance of the warrants for which the State applied.
1101313 — PETITION DISMISSED.
MOORE, C.J., and STUART, BOLIN, PARKER, MURDOCK, SHAW, MAIN, WISE, and BRYAN, JJ., concur.
1101384 — JUDGMENT VACATED; CASE DISMISSED; APPEAL DISMISSED.
STUART, PARKER, MURDOCK, SHAW, and AVISE, JJ., concur.
BOLIN, MAIN, and BRYAN, JJ., concur in the rationale in part and concur in the result.
MOORE, C.J., concurs in the result.
1110158 — PETITION DISMISSED.
MOORE, C.J., and STUART, BOLIN, PARKER, MURDOCK, SHAW, MAIN, AVISE, and BRYAN, JJ., concur.
1110310 — JUDGMENT VACATED; CASE DISMISSED; APPEAL DISMISSED.
STUART, PARKER, MURDOCK, SHAW, and AVISE, JJ., concur.
BOLIN, MAIN, and BRYAN, JJ., concur in the rationale in part and concur in the result.
MOORE, C.J., concurs in the result.
1130598 — PETITION GRANTED AND WRIT ISSUED BY ORDER DATED MARCH 25, 2014.
MOORE, C.J., and STUART, BOLIN, PARKER, MURDOCK, SHAW, MAIN, AVISE, and BRYAN, JJ., concur.

. Rule 3.13 provides:
"A person aggrieved by an unlawful search and seizure may move the court for the return of the property seized on the ground that he or she is entitled to lawful possession of the property .which was illegally seized. The judge shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted, the property shall be restored. If a motion of return of property is made or comes on for hearing after an indictment or information is filed; it shall be treated also as a motion to suppress evidence.”

. ' The other entities who are not parties to the cases before us also withdrew their motions for return of property.

. Rule 41(g) of the Federal Rules of Criminal Procedure, which is virtually identical to our Rule 3.13, reads as follows:
"(g) Motion to Return Property. A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property’s return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.”
The provision in Rule 41(g) for the return of property was part of Rule 41(e). "In 2002, the motion-to-return provision was re-designated Rule 41(g). Courts recognize that case law interpreting former Rule 41(e) generally applies to current Rule 41(g).” 3A Fed. Prac. & Proc. Crim § 690, Motion to Return Property (4th ed.2013).

. "In esse” is defined as "in being.” Black's Law Dictionary 840 (9th ed. 2009).

. Like-a criminal prosecution, a civil forfeiture action is a mechanism available to the executive branch for the enforcement of criminal laws making the possession of certain property illegal. See, e.g., Macon County Greyhound Park, 43 So.3d at 591 (noting that a forfeiture statute applicable to gambling devices, § 13A-12-30, Ala.Code 1975, is "a provision found in the Criminal Code,” and disallowing an independent proceeding initiated by the defendant that would have preempted a potential forfeiture action by the State).

. In such a case, if the court were to agree as to the deficiency in the procedures by which the property was seized, the property could be returned to its owner with presumably little or no prejudice to the State's prosecution of its case, given the fact that such property would, in that event, be subject to the exclusionary rule anyway.

. If, in the end, the executive branch is proven wrong in its interpretation of the constitution or a statutory provision, then so be it. The role of making arrests and initiating prosecutions nonetheless lies in the first instance with the executive branch, and the mere fact that it might make an error of judgment as to such a matter is not a sufficient ground for concluding that it has acted beyond the power delegated to it.

. The game we described in Cornerstone contemplates a group activity involving multiple players competing against each other. 42 So.3d at 86.

. Most of, if not all, the "bingo” amendments throughout the State also contain specific restrictions on who may operate bingo games and the use and distribution of proceeds from those operations. Questions regarding compliance with such requirements are not before us in the present case.
Nor does the fact that the machines at issue in both Judge Brown’s order and Judge Jones-Osborne’s action use "PIN” numbers change anything. The characteristics of inserting a PIN number and ejecting a ticket are similar to the characteristics of the machines described in Barber v. Jefferson County Racing Ass'n, 960 So.2d 599 (Ala.2006), which the Court concluded were characteristics indicative of slot machines. In reaching this conclusion, the Court stated that it looks at "the substance and not the semblance of things, so as to prevent evasions of the law.” 960 So.2d at 611. Judge Brown stated in his orders that he was "aware” of this Court’s decision in Barber; it appears that he and Judge Jones-Osborne too readily discounted its significance.